IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------
RATES TECHNOLOGY INC.,

      Plaintiff,

  v.

QWEST COMMUNICATIONS           Civil Action No. 07-442(JJF)
CORPORATION AND QWEST
COMMUNICATIONS
INTERNATIONAL, INC.,

      Defendants

---------------------------------------------

## DECLARATION OF ROBERT L. EPSTEIN

I, Robert L. Epstein, hereby declare:

    1.    I am a partner in Epstein Drangel Bazerman & James, LLP, a law firm specializing in intellectual property matters, located at 60 East 42nd Street, Suite 820, New York, New York 10165.  The matters stated below are true of my own knowledge, and if called as a witness, I could and would testify truthfully to the same.

2. I make this declaration in support of Plaintiff Rates Technology Inc.'s opposition to Defendants' Motion to Dismiss Plaintiff's Complaint or, in the Alternative, for a Stay Pending Reexamination of U.S. Patent No. 5,425,085.

3. I am a patent attorney registered to practice before the United States Patent and Trademark Office (USPTO) since 1973. I have over thirty years experience in preparing and prosecuting patent applications, and representing clients in related patent matters, before the USPTO.

4. I am admitted in good standing to practice before the courts of the State of New York, the United States District Courts for the Southern and Eastern Districts of New York, the Court of Appeals for the Second Circuit, the Court of Appeals for the Federal Circuit and the Supreme Court of the United States of America.

5. Over the last twenty two years, I have represented Rates Technology Inc. (RTI) on a number of intellectual property matters including: (a) the original prosecution before the USPTO of the applications upon which U.S. Patent Nos. 5,425,085 ('085) and U.S. Patent No. 5,579,769 ('769), the RTI patents involved in this lawsuit (collectively the "RTI patents") are based, leading to the allowance of each of the RTI patents; (b) the 1999 reexamination by the USPTO of each of the RTI patents, leading to the confirmation of the validity of all of the claims of each of the RTI patents; and (c) the current reexamination by the USPTO of the '085 patent. As a result, I am familiar with both of the RTI patents involved in this case, the prosecution history of each RTI patent, the reexamination history of each RTI patent and the references considered by the USPTO in conjunction with the original prosecution of each of the RTI patents, the 1999

reexaminations of each of the RTI patents and the current reexamination of the '085 patent.

6. I have also provided litigation support to RTI's counsel in a variety of litigations involving the patents asserted in this lawsuit by RTI. Several of those litigations involved VoIP telephone systems operated by various Internet telephone service providers. As a result of my work on these litigations, I have become familiar with the components of VoIP telephone systems and the operation thereof.

7. RTI's Complaint against Qwest Communications Corporation and Qwest Communications International, Inc. (collectively "Qwest") in this case alleges, in part, that Qwest directly and contributorily infringes the claims of '085 patent and the claims of the '769 patent. Only one of those patents, the '085 patent, is currently involved in a reexamination before the USPTO. The '769 patent is not currently under reexamination.

8. As is true with respect to all current reexaminations, all non-confidential documents in the current reexamination of the claims of the '085 patent are accessible on the USPTO website and hence are of public record, available for review by anyone having a computer with an Internet connection.

9. In its motion, Qwest argues that RTI's Complaint should be dismissed in its entirety because: (a) Qwest's OneFlex Services do not infringe the RTI patents and (b) the claims of the'085 patent are invalid because some of the '085 claims have been preliminarily rejected in a first Office Action in the current reexamination.

10. Regarding the non-infringement argument, RTI's complaint alleges that Qwest directly and/or contributorily infringes the claims of the RTI patents. RTI's theory of direct infringement of the main claim (claim 1) of the '085 patent with regard to the

3

Qwest OneFlex systems is set forth in the Qwest OneFlex Systems Claim Chart annexed hereto as Exhibit A and the accompanying diagram annexed hereto as Exhibit B.

11. Exhibits A and B provide RTI's element-by-element analysis of how the main claim of the '085 patent is directly infringed by the Qwest OneFlex systems. This is the type of claim analysis typically presented by a plaintiff to the factfinder at trial to demonstrate infringement.

12. Qwest argues that the OneFlex systems cannot possibly infringe the claims of the '085 patent because the OneFlex systems do not include a database means for storing billing rate parameters or a means for addressing the database means for identifying a plurality of communications switch paths. RTI contends that the Qwest OneFlex systems do, in fact must, have a database in which cost information relating to possible routes is stored and must have a means for addressing that database to obtain the information stored therein.

13. Qwest's OneFlex systems are internet based telephone systems which use voice over internet protocol (VoIP) technology to provide subscribers to the systems with real-time, two-way voice communication capability, as well as voice mail, integrated messaging and other related telecommunications services over a broadband connection. The OneFlex systems employ Qwest OneFlex VoIP Adapters connected between the subscriber's telephone and the subscriber's computer which convert the analogue signals from the subscriber's telephone into digital signals which are forwarded via the internet to a call processing center which forms a part of the OneFlex systems. The call processing center automatically determines the route that the call will follow as it works

its way through the system to the destination telephone and controls the various routers, relays and gateways which actually form the pathway for the call.

14.     In order for the call processing center to accurately and efficiently route the high volume of calls that the system must handle, it must have a computer with a database that stores cost-related information for the various possible routes for a telephone call and a circuit to address that database to obtain the stored information upon which the call routing is based.

15.     For example, a dialed call from a OneFlex subscriber is sent to a central call processing center which has a computer with database that stores the address of each telephone in the OneFlex system. As an initial matter, the dialed number is compared in the computer database to each of the stored subscriber telephone numbers to determine if the call is destined to a VoIP capable subscriber telephone or not. If the call is destined for a VoIP capable subscriber telephone, it will be routed via the internet in digital form to the subscriber's telephone where it will be converted into an analog signal. If not, the call will be converted back to analog and at some point placed ("dropped" is the term that is used) back to the public switched telephone network (PSTN) (which is the non-internet telephone network that existed prior to internet telephone systems) and sent from that location on the PSTN to the non-subscriber telephone, just like a non-internet based call.

16.     If it is determined that the call is directed to the telephone of another OneFlex subscriber, and hence the called telephone is that of a subscriber and is VoIP capable, it will be sent through various relays and routers in the Qwest system to an IP Gateway (sometimes called a border controller or gateway) within the OneFlex system to the subscriber destination telephone. The call processing center will consult the computer

database to select which of the many possible relays, routers and IP gateways in the system are used to route the call. This selection process is accomplished by taking into account the available capacity of each component and the cost of utilizing that component to route the call such that the call is routed in the most economical manner.

17.    On the other hand, if the call is destined for a telephone that is not within the OneFlex system, that is, to the telephone of a non-subscriber, that call must at some point be "dropped" onto the PSTN so that it can be received by the non-subscriber telephone. In order to that efficiently, the call processing center must determine which of the many possible PSTN gateways in the OneFlex system can transfer the call to the destination telephone at the least cost.

18.    For example, assume that the calling telephone is in Seattle and the called non-subscriber called telephone is located in New York. The OneFlex system has PSTN gateways in Ohio, Texas and New Jersey. The call processing center will use the dialed number to access the computer database and determine the cost for sending the call through each of the PSTN gateways from which it will be dropped to the PSTN and thereafter be routed by the PSTN to the destination telephone. Commonly (but not always), the PSTN gateway in New Jersey will be preferred because the overall cost of the call using that PSTN gateway will be less that for the other routes, due to the proximity of the New Jersey PSTN gateway to the New York non-subscriber telephone. However, if the PSTN gateway in New Jersey has no available routing capacity because it is already handling all the calls it can handle, then the call processing center will successively chose the other PSTN gateways until the next least cost route with capacity is determined.

19. If the call is to a non-subscriber in France, for example, and the Qwest system has no PSTN gateway located in France, long distance carrier routing must take place between the nearest PSTN gateway to the destination telephone (for example, a PSTN gateway in the UK) and the destination telephone. The call processing center will consult the cost information in the computer database to select one of several possible long distance carriers to send the call from the PSTN gateway in the UK to the destination telephone in France.

20. Given the high volume of calls handled by the system, the speed with which each call must be routed and the variations in cost inherent in the many possible routes, it is not possible to perform the routing functions without a sophisticated computer and a database containing cost information for the various routes.

21. Mr. Scivicque, in his declaration (Exhibit I to the Baron Declaration) says that the different OneFlex services do not all use the same call routing systems and that none use a database for storing billing rate parameters that is addressed for identifying communication switch paths. Mr. Scivicque provides no technical information or documentation upon which a person skilled in the field of VoIP telephone systems could possibly understand how calls could be routed in any one of the OneFlex systems without a computer with such a database. He does not reveal how calls are routed in any one of the OneFlex systems at all. He does not state what hardware could be used to route calls instead of a computer with a database that stores cost-related information or how the calls could be routed without some means of addressing such a database.

22. I believe that the Declaration of Mr. Scivicque does not address the possibility that the database and addressing means components that he insists are not

present in the Qwest OneFlex system itself are present in a part of the VoIP system provided by another entity that is connected to the portion provided by Qwest.

23.  Should that be the case, Qwest's non-infringement defenses are still totally without merit because, under those circumstances, the Qwest OneFlex systems still infringe the '085 claims, under the theory of contributory infringement..

24.  Regarding contributory infringement of the claims of the '085 patent by the Qwest OneFlex systems, contributory infringement does not require that the Qwest system itself meet each element of the claims, only that the overall system formed by Qwest and another provider directly infringe the claims.

25.  Contributory infringement is defined by statute:

**§ 271  Infringement of patent**

(c) Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use, shall be liable as a contributory infringer.

26.  A finding of contributory infringement requires only that the infringer provide a part or parts of a directly infringing system that are not suitable for substantial non-infringing use. Accordingly, even if all of Mr. Scivicque's assertions about the components of Qwest systems that are lacking are literally true, as long as the portions of the overall system that Qwest does provide are specifically configured for use in a

8

directly infringing VoIP telephone system, Qwest is still guilty of contributorily infringing the '085 patent claims.

27. Regarding the '769 patent, the claims of the that patent relate to a method of updating a call rating database, which could (but does not have to) be the type of computer database used in a VoIP telephone system, such as the OneFlex systems. As can be plainly seen from the explanation above, the efficiency of a VoIP telephone system is directly related to how current the cost-related information is in the call processing computer database.

28. For example, since subscribers are added to and deleted from the OneFlex systems daily, if the address information for all subscriber telephones in the database is not accurate, calls will be dropped to the PSTN by the call processing computer when they could have been sent entirely within the system, adding unnecessary cost. Further, relays, routers and PSTN gateways are added, deleted and moved, and the costs associated with sending calls through those components change as that occurs. Still further, tariffs associated with PSTN call routing (local, intralatta, interlatta and long distance) change constantly.

29. Mr. Scivicque states in his declaration that none of the OneFlex services use a call rating device that employs any method for updating billing rate parameters. Again, he provides no technical information or documentation that indicates how any of the OneFlex services could operate without current cost-related information upon which to base call routing decisions.

30. Even if one could take Mr. Scivicque's statements at face value, at best all those do is highlight factual issues that cannot possibly be resolved on a motion for

summary judgment. However, it is respectfully submitted that Mr. Scivicque's statements lack creditability.

31.   Regarding Qwest's second basis for dismissal, the alleged invalidity of the '085 claims due to the preliminary rejection in the first Office Action of the current reexamination, Qwest mischaracterizes the import of a preliminary rejection in the first Office Action of a reexamination and in particular, the responsibilities of a plaintiff in that regard..

32.   Qwest cites no authority, and I am not aware of any authority, that requires a plaintiff to advise a defendant in a patent infringement suit that the claims asserted are the subject of a reexamination, or of the status of the reexamination, as such information is publicly available.

33.   Qwest cites no authority, and I am not aware of any authority, that supports the proposition that the failure of a plaintiff to advise a defendant in a patent infringement suit about a reexamination or the status of same is grounds for dismissal of the patent infringement lawsuit under Rule 12(b)(6) or otherwise.

34.   Qwest cites no authority, and I am not aware of any authority, that supports the proposition that patent claims involved in a reexamination are considered to be are invalid or unenforceable until there has been a final decision that the claims are invalid or unenforceable.

35.   Qwest mischaracterizes the status of the current reexamination of the claims of the '085 patent. A request for reexamination is not granted unless the USPTO believes that the requestor has raised a prima facie new issue relating to patentability. Accordingly, most reexaminations involve at least the issuance of a first Office Action

with a preliminary rejection of claims based upon the prior art patents or publications presented by the requester. However, the issuance of an Office Action with a preliminary rejection is by no means a determination that the rejected claims are actually invalid or unenforceable. It is more like an allegation of invalidity, to which the patent owner may respond.

36.     Once the first Office Action with a preliminary rejection is issued in a re-examination, the patent owner has an opportunity to present arguments as to why the claims are not rendered unpatentable by the prior art cited by the requestor and/or, under certain circumstances, why the cited prior art is not applicable because of an earlier date of invention of the patented invention.

37.     In the present reexamination, there has been a first Office Action with a preliminary rejection of claims 1-5, 7-16 and 18-26 of the '085 patent and a confirmation of the patentability of claims 6 and 17, see Exhibit B to the Baron Declaration.

38.     However, a review of RTI's response to the preliminary rejection in the first Office Action, Exhibit C to the Baron Declaration, shows that RTI has advanced significant arguments on the merits with regard to each reference cited by the Examiner as a basis for rejection of claims under 35 USC §102(b) of the Patent Law (anticipation) as well as the declarations of the inventors to demonstrate an earlier date of invention of the patented invention than the dates of the references cited as a basis of rejection of claims under 35 USC §103(a) of the Patent Law (obviousness).

39.     In footnote 4 of page 2 of Qwest's Brief, Qwest states: "RTI's response to the PTO's invalidity ruling was to file a declaration by Mr. Weinberger "swearing behind" §102(b) prior art." Clearly the author of that comment did not take the time to

read RTI's submission, because that is not at all the case. RTI presented arguments against each of the references cited under 35 USC §102(b) references on the merits. The declarations of Mr. Weinberger and Mr. Lee, the inventors of the subject matter of the '085 patent, were submitted to "swear back" of references cited under 35 USC §103(a) only.

40. As is plain to see from RTI's response, RTI has good grounds to believe that the patentability of all of the claims of the '085 patent will be confirmed by the United States Patent and Trademark Office in this reexamination, as they were in the 1999 reexamination of the '085 patent.

41. In any case, by statute, each claim of an issued patent is presumed valid and it is the burden of one who asserts invalidity to establish invalidity. 35 USC §282 reads in pertinent part:

> A patent shall be presumed valid. Each claim of a patent whether independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; … The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.

42. Thus, it is clear that under the situation as it exists today, the claims of '085, although preliminarily rejected in the first Office Action of the current reexamination, are and must be considered valid and unenforceable by this Court.

43. To the extent that the Court deems the Qwest motion to be a motion for summary judgment, additional discovery relating to the structure and operation of the Qwest systems is required by RTI because there is insufficient publicly available information to allow RTI to completely respond. For example, RTI explained above that

Qwest's OneFlex systems must have a database in which cost information relating to possible routes is stored, and must also have a means for addressing that database to obtain the information stored therein. But in order to provide further evidence to support RTI's '769 patent infringement claim, it is necessary for RTI to understand how the database in the OneFlex systems is updated. Because the method that the OneFlex systems use to update these databases is software- or firmware-based - and therefore is essentially "hidden" within the system - and RTI cannot purchase or otherwise access the whole OneFlex system, or determine how the database updating takes place by reverse engineering components that can be purchased, or by any other means, there appears to be no way that RTI can ascertain how the OneFlex systems update their databases except through discovery, and RTI is entitled to use discovery to obtain this information in order to develop its infringement claims and supplement its pre-filing investigation.

I declare under penalty of perjury under the laws of the United States of America and the State of Delaware that the foregoing is true and correct.

Executed this 3rd day of September, 2007, at New York City, New York

_____
Robert L. Epstein