IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RATES TECHNOLOGY INC., )
                Plaintiff, )
)
          v. )
)
QWEST COMMUNICATIONS )
CORPORATION AND QWEST )
COMMUNICATIONS INTERNATIONAL, )
INC., )
)
               Defendants )

Civil Action No. 07-442 (JJF)

**ORAL ARGUMENT REQUESTED**

## DEFENDANTS' MOTION TO CONTINUE STAY

Defendants Qwest Communications Corporation and Qwest Communications International Inc. ("Qwest") respectfully move to continue the stay in this action pending the conclusion of all proceedings, including all appeals, arising out of the United States Patent and Trademark Office's reexamination of U.S. Patent No. 5,425,085 ("the '085 patent") which has been asserted against Qwest by Plaintiff Rates Technology, Inc. ("RTI").

On March 7, 2008, the Patent Office issued a final rejection over all assertable claims of the '085 patent (Exhibit 1, USPTO Final Rejection). This Final Rejection closes prosecution of the '085 patent reexamination. The next logical step for RTI is to file an appeal to the Patent Office's Board of Patent Appeals and Interferences, a process that, if the examiner's Final Rejection is any indication, will result in either no assertable claims or claims that look far different from the ones RTI is asserting against Qwest now.

On September 28, 2007, Qwest filed a motion to dismiss partially based on the Patent Office's then non-final rejection of the assertable claims of the '085 patent (D.I.. 10). This latest action by the Patent Office substantiates Qwest's position that the '085 patent is invalid and highlights the inequity in the particular circumstances of this case, as discussed more fully at

hearing on October 5, 2007 (*see* D.I. 21 at 4:16-8:23) of asking this Court to expend resources on, and Qwest to shoulder the burden and expense of defending itself in a litigation against claims the Patent Office has determined are not patentable. Because the '085 patent and the other patent-in-suit, U.S. Patent No. 5,519,769 ("the '769 patent"), share subject matter and have common claim terms, the patent office's final analysis on the '085 patent will be particularly relevant on claim construction and prior art issues for both patents.

Given this new set of circumstances and the specific facts presented here, Qwest believes it is more important than ever that the case remain stayed pending Rate's expected appeal of the Final Rejection, and Qwest therefore requests this court to continue the current stay. Given that the results of the reexamination signal the death knell for Defendant Rates' claims in this suit, Qwest assumes that it will appeal the Final Rejection to the Board of Patent Appeals and Interferences. If any claims survive (which Qwest believes is unlikely), it is anyone's guess how the Board will construe those claims and what the claims will ultimately be held to cover (if anything). Under these circumstances, it makes little sense for the Court to devote its time and resources given the specific circumstances of this case to this lawsuit when the outcome of the appeals process could so heavily influence these proceedings or result in a conflict that would invite an appeal of this court's decision.

The relief Qwest asks for here is not extraordinary. Recently, in a group of patent cases in similar postures as to the one here (i.e., the patents-in-suit had been finally rejected in reexamination proceedings and were on appeal within the PTO), the Court stayed the actions pending the Patent Office's final determination of validity in the reexamination appeals. *See NTP, Inc. v. T-Mobile USA, Inc. et al.*, Nos. 3:07-CV-548 through 551 (E.D. Va. Nov. 2, 2007). (Memorandum Opinion and Order attached at Exhibits 2 and 3, respectively). The Court ordered

the case stayed reasoning that (1) the cases were early in litigation; (2) the PTO's proceedings will greatly assist the Court in evaluating NTP's claims; and (3) a stay will not cause irreparable harm. The same reasoning applies here, given the specific circumstances of this case.

Where pending PTO reexamination proceedings may simplify or narrow the issues in dispute there is abundant precedent for granting a stay. *See, e.g.*, *Ralph Gonnocci Revocable Living Trust v. Three M Tool & Mach. Inc.*, 68 U.S.P.Q. 2d 1765, 1758, No. 02-74796, 2003 WL 22870902 (E.D. Mich. Oct. 7, 2003) ("the Patent Office's determination will be beneficial to the efficient resolution of this action. The Patent Office may resolve any remaining disputes [and] simplify the issues"); *see also Hewlett-Packard Co. v. Acuson Corp.*, No. C-93-0808 MHP, 1993 WL 149994 at *2 (N.D. Cal. May 5, 1993) ("[C]ourts need not expend unnecessary judicial resources by attempting to resolve claims which may be amended, eliminated, or lucidly narrowed by the patent reexamination process and the expertise of its officers."). This reasoning is compelling where the patent in suit has been *finally rejected* by a patent examiner, subject only to a right of appeal within the Patent Office.

Reexamination of the '085 Patent will likely affect this Court's resolution of many issues relating to both the '085 and '769 Patents, including claim construction and prior art. While the second patent in suit here, the '769 patent, is not itself in reexamination, the '769 patent claims a system for updating the billing rate parameters used by the least cost routing device claimed in the '085 patent. Accordingly, both patents use the claim term "billing rate parameters" as a key term in claiming the least cost routing system.

In a similar situation involving patents with related subject matter, a stay pending reexamination of a patent related to the patent in suit has been ordered even though the patent in reexamination was not being asserted, citing four specific benefits:

3

(1) many discovery issues relating to prior art may be alleviated; (2) the record of the reexamination likely would be entered at trial; (3) the issues, defenses, and evidence will be more easily limited in pre-trial conferences following a reexamination; and (4) the outcome of the reexamination process may encourage settlement without further involvement of the court.

*Alloc, Inc. v. Unilin Decor N.V.*, No. 03-cv-253-GMS, 2003 WL 21640372, at *2 (D. Del. July 11, 2003). Each of these cited benefits applies here.

The harm to Qwest and the unnecessary expenditure of this Court's resources, if this infringement litigation proceeds after a final rejection has been issued by the reexamination attorney is clear. If the case remains active pending appeal of the final rejection, Qwest and this court are faced with the very real possibility of having to expend significant resources on issues and claims that are ultimately found by the Board of Patent Appeals to be entirely irrelevant. For example, if this case were to proceed, the court and litigants would surely expend significant resources on summary judgment briefing and arguments related to the final rejection. Any appellate decision relating to that rejection could result in re-interpretation of claims requiring the parties to re-brief (and the court to reconsider) summary judgment arguments, or worse, could provide the basis for appealing a summary judgment ruling. Such a decision could also, as explained above, lead to re-litigation of claim construction and other issues on the remaining patent, which is a likely scenario here given the relatedness of the patents.

The situation that the parties currently face is very different than the point at which we started. The assertable claims of the main patent in suit *did not survive reexamination*. Whether the rejection will be affirmed or modified on appeal (and how it might be modified) are unclear. Either way, the appeal decision will have significant impact on this litigation in terms of how the parties deal with summary judgment on the '085 patent and how they construe the '769 patent

claims. Requiring Qwest and the court to go forward under such circumstances is both illogical and unfair.

Accordingly, Qwest respectfully requests the Court enter an Order substantially similar to the proposed order attached hereto.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*Mary T. Dugan*

Melanie K. Sharp (No. 2501)
Monté T. Squire (No. 4764)
Mary F. Dugan (No. 4704)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801

P.O. Box 391
Wilmington, Delaware 19899-0391
(302) 571-6681
msharp@ycst.com

Steven M. Bauer
Jacob K. Barron
PROSKAUER ROSE LLP
One International Place
Boston, MA 02110-2600
(617) 526-9600
sbauer@proskauer.com

Dated: March 31, 2008

*Attorneys for Qwest Communications Corporation and Qwest Communications International, Inc.*

DB02:6701871.1                                                                 066550.1001

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RATES TECHNOLOGY INC., )
)
           Plaintiff, )
)
      v. )
)   Civil Action No. 07-442 (JJF)
QWEST COMMUNICATIONS )
CORPORATION AND QWEST )
COMMUNICATIONS INTERNATIONAL, )
INC., )
)
          Defendants )

## **[PROPOSED] ORDER**

Upon consideration of Defendants' Motion To Continue Stay Pending

Reexamination Of U.S. Patent No. 5,425,085.

Defendants' Motion is **GRANTED**.

**IT IS HEREBY ORDERED** this _____ day of _____, 2008 that this

action is **STAYED**.


_____
The Honorable Joseph J. Farnan
United States District Judge

# EXHIBIT 1

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/007,939 | 02/14/2006 | 5425085 | 6f749/4 | 9558 |

7590          03/07/2008

Robert L. Epstein ESQ.
EPSTEIN DRANGEL BAZERMAN & JAMES LLP
60 East 42nd St.
Suite 820
New York, NY   10165

| EXAMINER |
|---|
| |

| ART UNIT | PAPER NUMBER |
|---|---|
| | |

DATE MAILED: 03/07/2008

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 10/03)

UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

KORY D. CHRISTENSEN
STOEL RIVES LLP
201 SOUTH MAIN ST.
ONE UTAH CENTER, SUITE 1100
SALT LAKE CITY, UT 84111

MAILED

MAR 0 7 2008

CENTRAL REEXAMINATION UNIT

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/007,939*.

PATENT NO. *5425085*.

ART UNIT *3992*.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

PTOL-465 (Rev.07-04)

| **Office Action in Ex Parte Reexamination** | **Control No.** 90/007,939 | **Patent Under Reexamination** 5425085 |
| | **Examiner** Joseph R. Pokrzywa | **Art Unit** 3992 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

a ☒ Responsive to the communication(s) filed on <u>26 July 2007</u> .    b ☒ This action is made FINAL.
c ☐ A statement under 37 CFR 1.530 has not been received from the patent owner.

A shortened statutory period for response to this action is set to expire <u>2</u> month(s) from the mailing date of this letter.
Failure to respond within the period for response will result in termination of the proceeding and issuance of an *ex parte* reexamination certificate in accordance with this action. 37 CFR 1.550(d). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**
If the period for response specified above is less than thirty (30) days, a response within the statutory minimum of thirty (30) days will be considered timely.

Part I    THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:

1. ☐ Notice of References Cited by Examiner, PTO-892.    3. ☐ Interview Summary, PTO-474.
2. ☐ Information Disclosure Statement, PTO/SB/08.    4. ☐ _____ .

Part II    SUMMARY OF ACTION

1a. ☒ Claims <u>1-29</u> are subject to reexamination.

1b. ☐ Claims _____ are not subject to reexamination.

2. ☐ Claims _____ have been canceled in the present reexamination proceeding.

3. ☒ Claims <u>6 and 17</u> are patentable and/or confirmed.

4. ☒ Claims <u>1-5, 7-16, 18-29</u> are rejected.

5. ☐ Claims _____ are objected to.

6. ☐ The drawings, filed on _____ are acceptable.

7. ☐ The proposed drawing correction, filed on _____ has been (7a)☐ approved (7b)☐ disapproved.

8. ☐ Acknowledgment is made of the priority claim under 35 U.S.C. § 119(a)-(d) or (f).

   a)☐ All  b)☐ Some*  c)☐ None    of the certified copies have

   1☐ been received.

   2☐ not been received.

   3☐ been filed in Application No. _____ .

   4☐ been filed in reexamination Control No. _____ .

   5☐ been received by the International Bureau in PCT application No. _____ .

   * See the attached detailed Office action for a list of the certified copies not received.

9. ☐ Since the proceeding appears to be in condition for issuance of an *ex parte* reexamination certificate except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte* Quayle, 1935 C.D. 11, 453 O.G. 213.

10. ☐ Other: _____

JOSEPH R POKRZYWA
PRIMARY EXAMINER
CRU - AU 3992

cc: Requester (if third party requester)
U.S. Patent and Trademark Office
PTOL-466 (Rev. 08-06)    Office Action in Ex Parte Reexamination    Part of Paper No. 20071009

| *Ex Parte Reexamination Communication* | Control No. 90/007,939 | | Patent Under Reexamination 5425085 |
|---|---|---|---|
| | Examiner Joseph R. Pokrzywa | | Art Unit 3992 |

**A SHORTENED STATUTORY PERIOD FOR RESPONSE TO THIS ACTION IS SET TO EXPIRE <u>2</u> MONTH(S) FROM THE MAILING DATE OF THIS LETTER. EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).** If the specified period for response is less than thirty (30) days, a response within the statutory minimum of thirty (30) days will be considered timely.

Joseph R. Pokrzywa
Primary Examiner
Art Unit: 3992

cc: Requester (if third party requester)

Application/Control Number: 90/007,939                                Page 2
Art Unit: 3992

## DETAILED ACTION

### *Response to Amendment*

1.      Patent Owner's amendment was received on 7/26/07, and has been entered and made of

record. Currently, claims 1-29 of U.S. Patent Number 5,425,085 (hereafter "the '085 Patent") are

pending, with claims 27-29 being newly added.

2.      In the previous Office action, dated 5/21/07, **claims 6 and 17** were deemed as patentable,

while **claims 1-5, 7-16, and 18-26** were rejected in the following manner:

        **Claims 1-5, 7-10, and 13** were rejected under 35 U.S.C. 102(b) as being

        anticipated by "Starplus SPX: General Description Installation and Maintenance

        Manual", published by Vodavi Communication Systems, dated September 1990

        (hereafter "Vodavi");

        **Claims 1-5, 7-10, 13-16, 18, 19, and 22-26** were rejected under 35 U.S.C. 102(b)

        as being anticipated by the publication "ISOETEC System/228: Technical Manual",

        published by ISOETEC Communications, Inc. and dated July 1998 (hereafter "Isoetec");

        **Claims 1, 2, 5, 7, and 10** were rejected under 35 U.S.C. 102(b) as being

        anticipated by the UK Patent Application No. 2,218,595, with the applicant being STC

        PLC, being published November 15, 1989 (hereafter "STC'595");

Application/Control Number: 90/007,939                                    Page 3
Art Unit: 3992

   **Claims 1-5, and 7-11** were rejected under 35 U.S.C. 102(b) as being anticipated

by Jabs *et al.* (U.S. Patent Number 5,173,933), issued on Dec. 22, 1992 (hereafter

"Jabs");

   **Claim 12** was rejected under 35 U.S.C. 103(a) as being unpatentable over Jabs.

   **Claims 20 and 21** were rejected under 35 U.S.C. 103(a) as being unpatentable

over Isoetec in view of Jabs.

3.  The declarations of Roger C. Lee and Gerald Weinberger filed on 7/26/07 under 37

CFR 1.131 have been considered but are ineffective to overcome each of the references of

Vodavi, Isoetec, STC'595, and Jabs.

4.  Particularly, each of the references of Vodavi, Isoetec, STC'595, and Jabs were published

over one year before the filing date of the instant application (08/210,670) of March 18, 1994,

which became the '085 Patent, thus being a statutory bar under 35 U.S.C. 102(b), and therefore

cannot be overcome by an affidavit or declaration under 37 CFR 1.131.

Application/Control Number: 90/007,939                                    Page 4
Art Unit: 3992

### *Response to Arguments*

5.      Patent Owner's arguments filed 7/26/07, with respect to the STC'595 reference, as read

on pages 34-37, have been fully considered and are persuasive.  The rejection of claims 1, 2, 5, 7,

and 10 under 35 U.S.C. 102(b) as being anticipated by STC'595 has been withdrawn.


6.      Particularly, the examiner agrees that STC'595 fails to expressly teach of a database in

which billing parameters for determining a least cost communication path, and a means for

addressing the database for identifying communication paths.  However, STC'595 can be

interpreted as inherently including a "means for comparing the cost rate of each path so as to

determine a least cost route", as the reference states on page 3, para. 4 through page 4, para. 1,

that the system "routes calls to the MCL network when it is cheaper to do so."  Contrarily, while

STC'595 does state on page 5, para. 2 that "A look-up table will be stored…which could have a

default data base installed", the reference falls short of teaching that the database particularly

stores "billing rate parameters for determining a least cost communication path".  Further,

STC'595 does not particularly discuss of "addressing the database for identifying

communication paths".  Thus, the rejection of claims 1, 2, 5, 7, and 10 under 35 U.S.C. 102(b) as

being anticipated by the UK Patent Application No. 2,218,595 (STC'595), is withdrawn.

Application/Control Number: 90/007,939                                    Page 5
Art Unit: 3992

7.    Patent Owner's arguments filed 7/26/07, regarding the rejections of independent claims

1, 14, and 24 by the references of Vodavi, Isoetec, and Jabs have been fully considered, but they

are not persuasive.


8.    Briefly, claim 1 requires a housing forming an enclosure having two jack means, a switch

means for disconnecting the telephone, a means for generating a current through the switch

means, a database means, a means for detecting and storing a telephone number, a means for

identifying a plurality of paths and the cost rate of each path, means for comparing the cost rates

so as to determine a least cost route, and means for generating a number sequence so as to route

the call through the selected communication path.


9.    The Patent Owner begins that the cited prior art of record fails to expressly disclose the

claimed "switch means" of each of claims 1, 14, and 24.  For instance, the Patent Owner argues

on pages 28-30, with respect to Vodavi, and pages 32-34, with respect to Isoetec, that the

references fail to teach of the switch means, as the references do not act to disable the signaling

function of the telephone during route selection by disconnecting the telephone from the

network.  First, in response to these arguments regarding the "switch means", the examiner notes

that, as independent claims 1, 14, and 24 are currently worded, the "disabling of the signaling

function of the telephone during route selection by disconnecting the telephone from the

network" is not particularly required.  As an example, claim 1 currently requires "switch means

operatively connected to said first jack means for disconnecting said first telephone from said

network".  There is no mention of disconnecting the telephone "to disable the signaling function

Application/Control Number: 90/007,939                                          Page 6
Art Unit: 3992

during route selection". The Patent Owner describes the "switch means" based on embodiments

in the specification, as noted on pages 25 and 26 of the Remarks, which describe a switch that

disconnects the telephone network during route selection.


10.     In this regard, MPEP 2111.01 states that:

>II.  IT IS IMPROPER TO IMPORT CLAIM LIMITATIONS FROM THE
SPECIFICATION "Though understanding the claim language may be aided by explanations
contained in the written description, **it is important not to import into a claim limitations that
are not part of the claim**. For example, a particular embodiment appearing in the written
description may not be read into a claim when the claim language is broader than the
embodiment." Superguide Corp. v. DirecTV Enterprises, Inc., 358 F.3d 870, 875, 69 USPQ2d
1865, 1868 (Fed. Cir. 2004). See also Liebel-Flarsheim Co. v. Medrad Inc., 358 F.3d 898, 906, 69
USPQ2d 1801, 1807 (Fed. Cir. 2004)(discussing recent cases wherein the court expressly rejected
the contention that if a patent describes only a single embodiment, the claims of the patent must
be construed as being limited to that embodiment);< E-Pass Techs., Inc. v. 3Com Corp., 343
F.3d 1364, 1369, 67 USPQ2d 1947, 1950 (Fed. Cir. 2003) ("Interpretation of descriptive
statements in a patent's written description is a difficult task, as an inherent tension exists as to
whether a statement is a clear lexicographic definition or a description of a preferred
embodiment. The problem is to interpret claims in view of the specification' without
unnecessarily importing limitations from the specification into the claims."); Altiris Inc. v.
Symantec Corp., 318 F.3d 1363, 1371, 65 USPQ2d 1865, 1869-70 (Fed. Cir. 2003) (Although the
specification discussed only a single embodiment, **the court held that it was improper to read a
specific order of steps into method claims where, as a matter of logic or grammar, the
language of the method claims did not impose a specific order on the performance of the
method steps**, and the specification did not directly or implicitly require a particular order). See
also paragraph *>IV.<, below. **>When< an element is claimed using language falling under the
scope of 35 U.S.C. 112, 6th paragraph (often broadly referred to as means or step plus function
language)**, the specification must be consulted to determine the structure, material, or acts
corresponding to the function recited in the claim. In re Donaldson, 16 F.3d 1189, 29 USPQ2d
1845 (Fed. Cir. 1994) (see MPEP § 2181- § 2186). [Emphasis added.]

Application/Control Number: 90/007,939                                    Page 7
Art Unit: 3992

11.      Further, MPEP 2106 [R-5] states, in part:

>USPTO personnel are to give claims their broadest reasonable interpretation in light of the supporting disclosure. In re Morris, 127 F.3d 1048, 1054-55, 44 USPQ2d 1023, 1027-28 (Fed. Cir. 1997). **Limitations appearing in the specification but not recited in the claim should not be read into the claim.** E-Pass Techs., Inc. v. 3Com Corp., 343 F.3d 1364, 1369, 67 USPQ2d 1947, 1950 (Fed. Cir. 2003) (claims must be interpreted "in view of the specification" without importing limitations from the specification into the claims unnecessarily). In re Prater, 415 F.2d 1393, 1404-05, 162 USPQ 541, 550-551 (CCPA 1969). See also In re Zletz, 893 F.2d 319, 321-22, 13 USPQ2d 1320, 1322 (Fed. Cir. 1989) ("**During patent examination the pending claims must be interpreted as broadly as their terms reasonably allow....** The reason is simply that during patent prosecution when claims can be amended, ambiguities should be recognized, scope and breadth of language explored, and clarification imposed.... An essential purpose of patent examination is to fashion claims that are precise, clear, correct, and unambiguous. Only in this way can uncertainties of claim scope be removed, as much as possible, during the administrative process.").< [Emphasis added.]

12.      Thus, in the instant case, the claimed "switch means" is simply a "means" that has the function "for disconnecting said first telephone from said network", whereby no specific "double-pole, double-throw switch", as argued by the Patent Owner on page 25, is required in the current claim language.   Further, reading a specific order into the claims would be improper, as indicated in the case law above.   Thus, there is no requirement that the disconnecting of the telephone occurs during route selection, or before the generating of a current through the switch means.   Therefore, independent claim 1, as well as independent claim 14, as currently worded, simply require a means that can disconnect the telephone from the network.

Application/Control Number: 90/007,939                                        Page 8
Art Unit: 3992

13.    With this, in response to Paten Owner's arguments on pages 29 and 30, with respect to

Vodavi, as noted in the Office action dated 5/21/07, Vodavi can be interpreted as teaching of a

means that has a function of disconnecting the telephone with the network.  On page 400-6 of

Vodavi, the "CO/FX/WATS trunk Board (COT8)" "is a loopstart 2 wire interface to the

telephone network", whereby "Detection circuitry is provided for disconnect supervision".

Further, on pages 400-8 of Vodavi, the "TIE Trunk Board (EMT4)" "provides the interface for

four E & M type 4 wire trunks", and on page 400-9, Vodavi continues with "The EMT4 board

also has the detection circuitry for disconnect supervision".  Thus, these boards, which have the

detection circuitry for disconnect supervision, provide a function of disconnecting the telephone

from the network, and therefore, can be viewed as "switch means ...for disconnecting said first

telephone from said network".


14.    Continuing, claim 1 additionally requires "means operatively connected to said switch

means for generating a current through said switch means to the first telephone, corresponding to

a current provided by said network".  As described in page 400-8, Vodavi states that in the TIE

Trunk Board (EMT4), "The E and M pair are DC signaling used for call set-up handshaking.

The E lead receives signals from the network (CO side) and the M lead transmits signals to the

network."  Thus, the TIE Trunk Board includes "means for generating current through the switch

means to the first telephone, corresponding to a current provided by said network."

Additionally, claim 1 requires a means for detecting and storing said telephone number, and a

means for generating a number sequence, which are both "operatively connected to said switch

means".  Vodavi teaches of a plurality of boards being connected within the Basic Cabinet, as

Application/Control Number: 90/007,939                                      Page 9
Art Unit: 3992

seen in pages 400-1 through 400-13, as well as on page 500-4. Thus, this can be interpreted as

being operatively connected to the switch means.


15.    Continuing, the Patent Owner argues on pages 31 and 32 that the billing parameters for

the possible routes are not stored in the database. Additionally, the Patent Owner argues that

Vodavi fails to teach of the database memory, containing the actual billing parameters associated

with each possible route, whereby subsequent to the detection of the dialed number, the database

is accessed and the cost rate of the call for each possible route is obtained based upon the stored

billing parameters, as the Patent Owner argues that Vodavi teaches of a pre-determined route

preference hierarchy. However, the current claim language does not particularly require "billing

parameters **associated with each possible route**", as claim 1 only requires "database means for

storing billing parameters for determining a least cost communication path". The examiner notes

that claim 1 currently requires "database means for storing billing rate parameters for

determining a least cost communication path for call corresponding to said telephone number",

and "means for addressing said database means for identifying a plurality of communication

switch paths to said second telephone and the cost rate of each path". The current claim

language does not particularly define "billing rate parameters", and does not particularly state

that the "cost rate" is stored in the database or is considered as the "billing rate parameter".

Further, the billing rate parameters do not necessarily need to be associated with each possible

route, as argued.

16.    As noted above, during patent examination, pending claims must be interpreted as

broadly as their terms reasonably allow.  With this, as seen on page 660-16, Vodavi teaches of

adding least cost routing route list tables.  Thus, the route list tables can be viewed in a broad and

reasonable interpretation as being "billing rate parameters", as the tables contain data that is

characteristic of the Least Cost Route, therein being a billing rate parameter.  As read in page

300-5, Vodavi states "In order for the LCR  to operate, the LCR feature must be activated in the

system and the routing data must be entered into the database."  Further, on page 660-16, Vodavi

states that "This command allows the user to add route lists for LCR use to the system".

Additionally, as read in page 640-1 through 640-5, Vodavi teaches of using TOLL tables.  These

TOLL tables can also be considered as "billing rate parameters".


17.    Further, the Patent Owner additionally argues on page 31 that Vodavi does not teach of

comparing the cost of each route after the number is dialed, and not on the basis of a pre-

determined route preference hierarchy.  The examiner notes that the claim does not require this

comparison occurring "subsequent to the detection of the dialed number".  As noted above, claim

1 currently requires "database means for storing billing rate parameters for determining a least

cost communication path for call corresponding to said telephone number".  With this, Vodavi

states on page 200-8 that the Least Cost Routing allows the automatic selection of the most

economical trunk according to the number dialed, with "The trunk groups within each route list

entry may ordered so that the most economical will be the first choice, the second most

economical group is the second choice, etc."  Thus, the cost rate of each path was compared at

some point, so as to determine the most economical, the second most economical, etc.

Application/Control Number: 90/007,939                                    Page 11
Art Unit: 3992

Therefore, using a broad, and reasonable interpretation, Vodavi is seen as teaching of "means for

comparing the cost rate of each path so as to determine a least cost route".

18.    Therefore, the rejection of claims 1-5, 7-10, and 13, as cited in the Office action dated

5/21/07, as being anticipated by Vodavi, is maintained and repeated in this Office action.

19.    Continuing, in response to Patent Owner's arguments on pages 32-34 regarding the

rejection of independent claims 1, 14 and 24 as being anticipated by Isoetec, the reference of

Isoetec is seen to teach of the "switch means". Similar to the discussion above with respect to

Vodavi, Isoetec is also seen to teach of a means for disconnecting the telephone to the network.

Isoetec discloses on page 4.131 that by pressing the RLS key or the switch-hook, a call is

disconnected. Further, as read in page 12.4, Isoetec states that "Normally, if the LCR key is

pressed during a call, the call is disconnected and a new LCR dial tone is connected to the

station." Thus, these sections show that Isoetec includes a means that disconnects the telephone

from the network. Further, as seen on pages 1.5-1.15, a number of port cards are utilized, along

with the CPU and the Voice and Data Control Modules. Additionally, on page 1.8, Isoetec states

"The Voice Control Module (p/n 15400) contains the circuitry necessary for voice switching and

conference connections." Therefore, Isoetec can be interpreted as including a means for

disconnecting said first telephone from said network, as required in the current claim language.

Application/Control Number: 90/007,939                                    Page 12
Art Unit: 3992

20.     Thus, the rejection of claims 1-5, 7-10, 13-16, 18, 19, and 22-26, as cited in the Office

action dated 5/21/07, as being anticipated by Isoetec, is maintained and repeated in this Office

action.

21.     Continuing, the Patent Owner argues on page 38 that the Jabs reference fails to teach if

the current generated by the interface is ever supplied to any station, much less through a "switch

means". However, the claim does not require this. As discussed above, claim 1 requires "a

switch means operatively connected to said first jack means for disconnecting said first

telephone from said network, means operatively connected to said switch means for generating a

current through said switch means to the first telephone, corresponding to a current provided by

said network". Further, the Patent Owner argues on pages 38 and 39 that the telecommunication

stations, or shipboard telephones, as taught by Jabs, are powered by electrical generators on the

ship, thus, not having the stations powered by current from a telephone network. However,

nowhere does claim 1 expressly state that the device is powered from current from the telephone

network. Contrarily, claim 1 requires "a means...for generating a current..." Thus, Jabs can be

interpreted as teaching the limitations of the claim.

22.     Continuing, on pages 39-40, the Patent Owner argues that Jabs does not teach of

comparing stored cost rates for the various communication carriers or media to determine the

least cost route, and thus does not disclose a database for storing billing parameters for the

various communication carriers or media, addressing circuitry to obtain the cost rates for each of

the communication carriers or media, or circuitry for comparing the cost rates to determine a

least cost rate. Currently, claim 1 further requires "database means for storing billing rate

parameters for determining a least cost communication path for call corresponding to said

telephone number, ...means for addressing said database means for identifying a plurality of

communication switch paths to said second telephone and the cost rate of each path, means for

comparing the cost rate of each path so as to determine a least cost route..."  First, as currently

worded, claim 1 does not specifically require "comparing **stored** cost rates" for the various

communication paths, as the claim does not state that cost rates are stored, as only "billing rate

parameters" are stored in the database means.   Further, claim 1 does not specifically require

"addressing **circuitry to obtain** cost rates", as the claim requires means for identifying the cost

rate.

23.      As noted in the Office action dated 5/21/07, Jabs teaches of a database storing billing rate

parameters in col. 12, lines 39-46, wherein "A plurality of tables are constructed to encompass

both standard and off-peak rates. The tables are structured such that the least expensive CES

resides at the top of the table and progressively more expensive coast earth stations towards the

bottom." This table of standard and off-peak rates can be considered as a database means that

stores billing rate parameters.  Further, these standard and off-peak rates are "identified" such

that the "least expensive CES resides at the top of the table and progressively more expensive

coast earth stations towards the bottom".  Continuing, because the table of rates is structured this

Application/Control Number: 90/007,939                                                Page 14
Art Unit: 3992

way, it is clear that the system of Jabs inherently compares the "cost rates of each path so as to

determine a least cost route".

24.     Therefore, the rejection of claims 1-5, 7-11, as cited in the Office action dated 5/21/07, as

being anticipated by Jabs, is maintained and repeated in this Office action.

### *Claim Rejections - 35 USC § 102*

25.     The text of those sections of Title 35, U.S. Code not included in this action can be found

in a prior Office action.

26.     **Claims 1-5, 7-10, and 13** are rejected under 35 U.S.C. 102(b) as being anticipated by

"Starplus SPX: General Description Installation and Maintenance Manual", published by Vodavi

Communication Systems, dated September 1990 (hereafter "Vodavi").

        Regarding *claim 1*, Vodavi discloses a device for routing telephone calls along a least

cost route originating from a first telephone to a second telephone having an associated telephone

number via a network having a plurality of alternate communication switch paths corresponding

to different carriers which can be chosen to route the call and normally providing a current to

said first telephone when said first telephone is in use [see page 200-8; also see page 300-5; also

see page 320-13; also see page 500-18], comprising

a housing forming an enclosure and comprising first jack means for connection to said

first telephone and second jack means for connection to said network [see pages 400-2 and 500-

2, being the "Basic Cabinet"; also see pages 400-5 through 400-11; also see page 500-16],

switch means operatively connected to said first jack means for disconnecting said first

telephone from said network [see page 100-1; also see pages 400-5 through 400-11; also see

page 500-16],

means operatively connected to said switch means for generating a current through said

switch means to the first telephone, corresponding to a current provided by said network [see

pages 410-1 through 410-2; also see page 500-16],

database means for storing billing rate parameters for determining a least cost

communication path for call corresponding to said telephone number [see page 200-8; also see

page 300-5, wherein "In order for the LCR to operate, the LCR feature must be activated in the

system and the routing data must be entered into the database."; also see pages 660-1 through

660-28, for instance page 660-16, wherein "This command allows the user to add route lists for

LCR use to the system. There are sixteen route lists in the system. Each route can have four

different time period entries. In each time period, eight trunk groups can have different priority

numbers and can reference different insert and delete tables."],

means operatively connected to said switch means for detecting and storing said

telephone number originating from the first telephone means for addressing said database means

Application/Control Number: 90/007,939                                    Page 16
Art Unit: 3992

for identifying a plurality of communication switch paths to said second telephone and the cost

rate of each path [see page 300-5; also see page 400-5; also see pages 660-1 through 660-28],

        means for comparing the cost rate of each path so as to determine a least cost route [see

page 200-8, wherein "The trunk groups within each route list entry may be ordered so that the

most economical group will be the first choice, the second most economical group is the second

choice, etc."; also see page 300-5], and

        means operatively connected to said switch means and said second jack means for

generating a number sequence corresponding to a desired carrier so that said call is routed

through said second jack means to the selected communication path and carrier to establish a

switched connection between said first telephone and said second telephone phone [see page

200-8; also see page 300-5, wherein "The dialed digits (or modified dialed digits) are outpulsed

on the trunk."].


        Regarding *claim 2*, Vodavi discloses the device discussed above in claim 1, and further

teaches that said least cost communication path parameters include the time and date of the call

[see page 300-5].


        Regarding *claim 3*, Vodavi discloses the device discussed above in claim 1, and further

teaches that said switch means connects said first telephone to said network during an incoming

call [see page 200-4].

Application/Control Number: 90/007,939                                             Page 17
Art Unit: 3992

Regarding *claim 4*, Vodavi discloses the device discussed above in claim 1, and further

teaches that an internal power supply connected to said means for generating a current [see

Figure 400.1 on page 400-2].

Regarding *claim 5*, Vodavi discloses the device discussed above in claim 1, and further

teaches that said means for generating said number sequence comprises a dual tone

multifrequency generator [see page 400-5].

Regarding *claim 7*, Vodavi discloses the device discussed above in claim 1, and further

teaches that said detecting means includes a dual tone multifrequency detector [see page 400-5].

Regarding *claim 8*, Vodavi discloses the device discussed above in claim 1, and further

teaches of means for maintaining the time and date so as to determine the least cost route based

on the time and date of the call [see pages 200.11, 230-2, and 300-5].

Regarding *claim 9*, Vodavi discloses the device discussed above in claim 1, and further

teaches that said cost may be given a bias for preference to a given carrier [see page 620-43,

being the priority level].

Regarding *claim 10*, Vodavi discloses the device discussed above in claim 1, and further

teaches of means for updating said database means with a current billing rate schedule [see pages

600-1 and 660-1 through 660-28].

Regarding *claim 13*, Vodavi discloses the device discussed above in claim 10, and further

teaches that said update means includes a modem for receiving signals through said telephone

line and downloading the update information [see Figure 400.4 on page 400-5, being the

"Modem Unit"; also see pages 400-19 and 600-1].

27.     **Claims 1-5, 7-10, 13-16, 18, 19, and 22-29** are rejected under 35 U.S.C. 102(b) as being

anticipated by the publication "ISOETEC System/228: Technical Manual", published by

ISOETEC Communications, Inc. and dated July 1998 (hereafter "Isoetec").

Regarding *claim 1*, Isoetec discloses a device for routing telephone calls along a least

cost route originating from a first telephone to a second telephone having an associated telephone

number via a network having a plurality of alternate communication switch paths corresponding

to different carriers which can be chosen to route the call and normally providing a current to

said first telephone when said first telephone is in use [see section 1.5 on page 1.18; also see

sections 10.1 and 10.2 on pages 10.1-10.3; also see section 10.6 on page 10.4], comprising

a housing forming an enclosure [228 Cabinet with the Main Distribution Frame (MDF)

on page 2.7 (Figure 2-1) and page 3.2 (Figure 3-1)] and comprising first jack means for

connection to said first telephone and second jack means for connection to said network [see

pages 1.2 and 1.5-1.15; also see pages 3.6-3.9; also see sections 3.6-3.9 on pages 3.20-3.23],

Application/Control Number: 90/007,939                                    Page 19
Art Unit: 3992

switch means operatively connected to said first jack means for disconnecting said first

telephone from said network [see pages 1.5-1.15; also see sections 3.6-3.9 on pages 3.20-3.23;

also see pages 4.131 and 4.146],

means operatively connected to said switch means for generating a current through said

switch means to the first telephone, corresponding to a current provided by said network [see

pages 1.5-1.16; also see sections 3.6-3.9 on pages 3.20-3.23],

database means for storing billing rate parameters for determining a least cost

communication path for call corresponding to said telephone number [see page 4.102-4.104; also

see pages 10.1-10.6, being the customized LCR Database; also see section 15.2],

means operatively connected to said switch means for detecting and storing said

telephone number originating from the first telephone means for addressing said database means

for identifying a plurality of communication switch paths to said second telephone and the cost

rate of each path [see pages 4.102-4.104; also see Figure 10-1 and pages 10.1-10.6, wherein

"This information includes number and types of facilities and services used, and the customer's

area code and exchange"; also see pages 4.103, 4.104 and 4.220],

means for comparing the cost rate of each path so as to determine a least cost route [see

page 10.1; also see pages 4.102 and 4.103], and

means operatively connected to said switch means and said second jack means for

generating a number sequence corresponding to a desired carrier so that said call is routed

through said second jack means to the selected communication path and carrier to establish a

switched connection between said first telephone and said second telephone phone [see pages

10.1-10.9; also see pages 4.102-4.104].

Application/Control Number: 90/007,939                                    Page 20
Art Unit: 3992

Regarding *claim 2*, Isoetec discloses the device discussed above in claim 1, and further teaches that said least cost communication path parameters include the time and date of the call [see pages 10.1-10.9; also see pages 4.102-4.112].

Regarding *claim 3*, Isoetec discloses the device discussed above in claim 1, and further teaches that said switch means connects said first telephone to said network during an incoming call [see page 1.21; also see pages 4.9-4.15].

Regarding *claim 4*, Isoetec discloses the device discussed above in claim 1, and further teaches that an internal power supply connected to said means for generating a current [see page 1.16].

Regarding *claim 5*, Isoetec discloses the device discussed above in claim 1, and further teaches that said means for generating said number sequence comprises a dual tone multifrequency generator [see pages 1.2, 1.8, and 1.15].

Regarding *claim 7*, Isoetec discloses the device discussed above in claim 1, and further teaches that said detecting means includes a dual tone multifrequency detector [see pages 1.2, 1.8, and 1.15].

Regarding *claim 8*, Isoetec discloses the device discussed above in claim 1, and further teaches of means for maintaining the time and date so as to determine the least cost route based on the time and date of the call [see pages 10.1-10.9; also see pages 4.102-4.112].

Regarding *claim 9*, Isoetec discloses the device discussed above in claim 1, and further teaches that said cost may be given a bias for preference to a given carrier [see pages 10.1-10.9; also see pages 4.102-4.112].

Regarding *claim 10*, Isoetec discloses the device discussed above in claim 1, and further teaches of means for updating said database means with a current billing rate schedule [see pages 10.1-10.9; also see pages 4.102-4.112].

Regarding *claim 13*, Isoetec discloses the device discussed above in claim 10, and further teaches that said update means includes a modem for receiving signals through said telephone line and downloading the update information [see page 1.24; also see pages 23.1 and 23.19].

Regarding *claim 14*, Isoetec discloses a device for routing telephone calls along a least cost route originating from a first telephone to a second telephone having an associated telephone number via a network having a plurality of alternate communication switch paths corresponding to different carriers which can be chosen to route the call and normally providing a current to said first telephone when said first telephone is in use [see section 1.5 on page 1.18; also see sections 10.1 and 10.2 on pages 10.1-10.3; also see section 10.6 on page 10.4], comprising

a housing forming an enclosure [228 Cabinet with the Main Distribution Frame (MDF) on page 2.7 (Figure 2-1) and page 3.2 (Figure 3-1)] and comprising first jack means for connection to said first telephone, and second jack means for connection to said network [see pages 1.2 and 1.5-1.15; also see pages 3.6-3.9; also see sections 3.6-3.9 on pages 3.20-3.23],

means positioned on said housing for visibly displaying the time and date [see Figure 1-4 on page 1.5; also see page 2.18; also see page 3.1, being the station port that provides digital data to digital display phones; also see Fig. 3-10 on page 3.16, whereby the I/O Panel, positioned on the housing of the cabinet 228, includes a connection to the monitor; also see page 4.181],

switch means operatively connected to said first jack means for disconnecting said first telephone from said network [see pages 1.5-1.15; also see sections 3.6-3.9 on pages 3.20-3.23; also see pages 4.131  and 4.146],

means operatively connected to said first jack means for disconnecting said first telephone from said network [see pages 1.5-1.15; also see sections 3.6-3.9 on pages 3.20-3.23; also see pages 4.131  and 4.146],

means operatively connected to said switch means for generating a current through said switch means to said first telephone corresponding to said current provided by said network [see page 1.18; also see page 2.4],

means operatively connected to said time and date display means and said switch means for receiving a predetermined dial sequence from said first telephone corresponding to a predetermined date and time to be displayed and means for changing the displayed time and date based on the received signals [see pages 4.79-4.81, whereby return times and return dates are programmed based on DTMF signals from the telephone],

database means for storing billing rate parameters for determining a least cost

communication path for a call corresponding to said telephone number, based on such factors as

the time and date of the call [see page 4.102-4.104; also see pages 10.1-10.6, being the

customized LCR Database; also see section 15.2],

means operatively connected to said switch means for detecting and storing said

telephone number originating from the first telephone [see pages 4.102-4.104; also see Figure

10-1 and pages 10.1-10.6, wherein "This information includes number and types of facilities and

services used, and the customer's area code and exchange"; also see pages 4.103, 4.104 and

4.220],

means for addressing said database means for identifying a plurality of communication

switch paths to said second telephone and the cost rate of each path [see pages 10.1-10.9; also

see pages 4.102-4.104],

means for comparing the cost rate of each path so as to determine a least cost route [see

pages 10.1-10.9; also see pages 4.102-4.104], and

means operatively connected to said switch means and said second jack means for

generating a number sequence corresponding to a desired carrier so that said call is routed

through said second jack means to the selected communication path and carrier to establish a

switched connection between said first telephone and said second telephone [see pages 10.1-

10.9; also see pages 4.102-4.104].

Application/Control Number: 90/007,939                                    Page 24
Art Unit: 3992

Regarding *claim 15*, Isoetec discloses the device discussed above in claim 14, and further

teaches of means positioned on said housing for manually changing the date and time of the

display [see Figure 1-4 on page 1.5; also see page 2.18; also see page 3.1, being the station port

that provides digital data to digital display phones; also see page 7.14; also see pages 4.79-4.81,

wherein return times and return dates are programmed based on DTMF signals received from the

telephone].

Regarding *claim 16*, Isoetec discloses the device discussed above in claim 14, and further

teaches that said means for generating said number sequence comprises a dual tone

multifrequency generator [see page 1.8, whereby the 228 system includes a "DTMF tone

generator" and a "DTMF tone receiver"; also see pages 4.79-4.81].

Regarding *claim 18*, Isoetec discloses the device discussed above in claim 14, and further

teaches that said detecting means includes a dual tone multifrequency detector [see pages 1.2,

1.8, and 1.15].

Regarding *claim 19*, Isoetec discloses the device discussed above in claim 14, and further

teaches of means for updating said database means with a current billing rate schedule [see pages

10.1-10.9; also see pages 4.102-4.112].

Application/Control Number: 90/007,939                                    Page 25
Art Unit: 3992

Regarding *claim 22*, Isoetec discloses the device discussed above in claim 19, and further

teaches that said update means includes a modem for receiving signals through said telephone

line and downloading the update information [see page 1.24; also see pages 23.1 and 23.19].

Regarding *claim 23*, Isoetec discloses the device discussed above in claim 14, and further

teaches that said cost may be given a bias for preference to a given carrier [see pages 10.1-10.9;

also see pages 4.102-4.112].

Regarding *claim 24*, Isoetec discloses an apparatus for displaying a time quantity which

can be initiated from a telephone of the type capable of generating dual tone multifrequency

signals [see page 1.8, whereby the 228 system includes a "DTMF tone generator" and a "DTMF

tone receiver"; also see pages 4.79-4.81, whereby return times and return dates are programmed

based on DTMF signals from the telephone] comprising

a housing forming an enclosure [228 Cabinet with the Main Distribution Frame (MDF)

on page 2.7 (Figure 2-1) and page 3.2 (Figure 3-1)] and comprising first jack means for

interconnection to said telephone [page 3.6], and second jack means for connection to a

telephone switching network [see page 2.4; also see pages 3.8 and 3.9],

said network normally providing a current to said telephone when said telephone is in use

[see page 1.18; also see page 2.4],

means positioned on said housing for visibly displaying a time quantity [see Figure 1-4

on page 1.5; also see page 2.18; also see page 3.1, being the station port that provides digital data

to digital display phones; also see Fig. 3-10 on page 3.16, whereby the I/O Panel, positioned on

the housing of the cabinet 228, includes a connection to the monitor; also see page 4.181],

switch means operatively connected to said first jack means for disconnecting said

telephone from said network [see page 1.8; also see page 2.4],

means operatively connected to said switch means for generating a current through said

switch means to said telephone corresponding to said current provided by said network [see page

1.16; also see page 2.4],

means operatively connected to said means for displaying a time quantity and said first

jack means for receiving said dual tone multifrequency signals, from said telephone when said

telephone is disconnected from said network [see page 7.14; also see pages 4.79-4.81, wherein

return times and return dates are programmed based on DTMF signals received from the

telephone],

said signals corresponding to said time quantity and for changing the displayed time

quantity based on signals from said telephone [see pages 4.79-4.81, whereby return times and

return dates are programmed based on DTMF signals from the telephone], and

means responsive to a dialing sequence originating on said telephone and operatively

connected to said switch means for connecting said telephone to said network [see pages 4.122-

4.127].

Regarding *claim 25*, Isoetec discloses the apparatus discussed above in claim 24, and

further teaches that said time quantity is the time of day [see pages 4.79-4.81, whereby return

times and return dates are programmed based on DTMF signals from the telephone].

Application/Control Number: 90/007,939                                        Page 27
Art Unit: 3992

Regarding *claim 26*, Isoetec discloses the apparatus discussed above in claim 24, and

further teaches that said time quantity is the date [see pages 4.79-4.81, whereby return times and

return dates are programmed based on DTMF signals from the telephone].

Regarding *claim 27*, Isoetec discloses a device for routing telephone calls along a least

cost route originating from a first telephone to a second telephone having an associated telephone

number via a network having a plurality of alternate communication switch paths corresponding

to different carriers which can be chosen to route the call and normally providing a current to

said first telephone when said first telephone is in use [see section 1.5 on page 1.18; also see

sections 10.1 and 10.2 on pages 10.1-10.3; also see section 10.6 on page 10.4], comprising

a housing forming an enclosure [228 Cabinet with the Main Distribution Frame (MDF)

on page 2.7 (Figure 2-1) and page 3.2 (Figure 3-1); also see page T.S. 2, wherein the cabinet has

dimensions of 16" high by 26" long by 15 ½" deep] and comprising first jack means for

connection to said first telephone and second jack means for connection to said network [see

pages 1.2 and 1.5-1.15; also see pages 3.6-3.9; also see sections 3.6-3.9 on pages 3.20-3.23],

switch means operatively connected to said first jack means for disconnecting said first

telephone from said network **during routing of a telephone call from said first telephone** [see

pages 1.5-1.15; also see page 4.102, wherein "…each station can be assigned a class of service

for LCR. This class of service determines under what circumstances a more expensive route may

be used if all the lines in the least expensive route are busy."; also see pages 4.161, 4.163, and

4.164, wherein "If LCR is used, the outside telephone number will automatically be dialed when

the outside line is seized."; also see page 4.220, showing how to place an outside call using LCR,

Application/Control Number: 90/007,939                                      Page 28
Art Unit: 3992

whereby the system selects an idle line in the least costly trunk group and dials the call;  also see

page 8.25, wherein "when a station places an outside line call, a running total of the call is kept.

When this cost exceeds the amount set for the station in "Cost Limit" a warning tone is given.

Thirty seconds after the warning tone, the system will terminate the call.", whereby with this,

Isoetec is teaching that system is operable to disconnect the telephone from the network;

alternatively, see page 12.3, wherein "If LCR attempts to dial a service and does not receive dial

tone from the carrier (e.g. a busy signal is reached) the line is released, and the telephone number

is dialed on the next less expensive service.", also wherein "The LCR HOOK FLASH option

allows the station user to flash (momentarily disconnect) the outside line when using LCR.

Normally, if the LCR key is pressed during a call, the call is disconnected and a new LCR dial

tone is connected to the station."; with this, Isoetec is teaching of a means for disconnecting the

telephone from the network during routing of a telephone call from the telephone.],

       means operatively connected to said switch means for generating a current through said

switch means to the first telephone, corresponding to a current provided by said network**, when

said first telephone is disconnected from said network by said switch means**  [see pages 1.5-

1.16; also see page 4.102, wherein "...each station can be assigned a class of service for LCR.

This class of service determines under what circumstances a more expensive route may be used

if all the lines in the least expensive route are busy.";  also see page 12.3, wherein "If LCR

attempts to dial a service and does not receive dial tone from the carrier (e.g. a busy signal is

reached) the line is released, and the telephone number is dialed on the next less expensive

service.", also wherein "The LCR HOOK FLASH option allows the station user to flash

(momentarily disconnect) the outside line when using LCR. Normally, if the LCR key is pressed

during a call, the call is disconnected and a new LCR dial tone is connected to the station."; with

these sections, Isoetec is teaching that corresponding to receiving no dial tone (e.g. a busy signal)

from the carrier, thus corresponding to a current provided by the network, a current is generated

through the switch means when the telephone is disconnected from the network.],

database means for storing billing rate parameters for determining a least cost

communication path for call corresponding to said telephone number [see page 4.102-4.104; also

see pages 10.1-10.6, being the customized LCR Database; also see section 15.2],

means operatively connected to said switch means for detecting and storing said

telephone number originating from the first telephone means for addressing said database means

for identifying a plurality of communication switch paths to said second telephone and the cost

rate of each path [see pages 4.102-4.104; also see Figure 10-1 and pages 10.1-10.6, wherein

"This information includes number and types of facilities and services used, and the customer's

area code and exchange"; also see pages 4.103, 4.104 and 4.220],

means for comparing the cost rate of each path so as to determine a least cost route [see

page 10.1; also see pages 4.102 and 4.103], and

means operatively connected to said switch means and said second jack means for

generating a number sequence corresponding to a desired carrier so that said call is routed

through said second jack means to the selected communication path and carrier to establish a

switched connection between said first telephone and said second telephone phone [see pages

10.1-10.9; also see pages 4.102-4.104].

Regarding *claim 28*, Isoetec discloses a device for routing telephone calls along a least

cost route originating from a first telephone to a second telephone having an associated telephone

number via a network having a plurality of alternate communication switch paths corresponding

to different carriers which can be chosen to route the call and normally providing a current to

said first telephone when said first telephone is in use [see section 1.5 on page 1.18; also see

sections 10.1 and 10.2 on pages 10.1-10.3; also see section 10.6 on page 10.4], comprising

a housing forming an enclosure [228 Cabinet with the Main Distribution Frame (MDF)

on page 2.7 (Figure 2-1) and page 3.2 (Figure 3-1)] and comprising first jack means for

connection to said first telephone, and second jack means for connection to said network [see

pages 1.2 and 1.5-1.15; also see pages 3.6-3.9; also see sections 3.6-3.9 on pages 3.20-3.23],

means positioned on said housing for visibly displaying the time and date [see Figure 1-4

on page 1.5; also see page 2.18; also see page 3.1, being the station port that provides digital data

to digital display phones; also see Fig. 3-10 on page 3.16, whereby the I/O Panel, positioned on

the housing of the cabinet 228, includes a connection to the monitor; also see page 4.181],

switch means operatively connected to said first jack means for disconnecting said first

telephone from said network **during routing of a telephone call from said first telephone** [see

pages 1.5-1.15; also see page 4.102, wherein "...each station can be assigned a class of service

for LCR. This class of service determines under what circumstances a more expensive route may

be used if all the lines in the least expensive route are busy."; also see pages 4.161, 4.163, and

4.164, wherein "If LCR is used, the outside telephone number will automatically be dialed when

the outside line is seized."; also see page 4.220, showing how to place an outside call using LCR,

whereby the system selects an idle line in the least costly trunk group and dials the call;  also see

page 8.25, wherein "when a station places an outside line call, a running total of the call is kept.

When this cost exceeds the amount set for the station in "Cost Limit" a warning tone is given.

Thirty seconds after the warning tone, the system will terminate the call.", whereby with this,

Isoetec is teaching that system is operable to disconnect the telephone from the network;

alternatively, see page 12.3, wherein "If LCR attempts to dial a service and does not receive dial

tone from the carrier (e.g. a busy signal is reached) the line is released, and the telephone number

is dialed on the next less expensive service.", also wherein "The LCR HOOK FLASH option

allows the station user to flash (momentarily disconnect) the outside line when using LCR.

Normally, if the LCR key is pressed during a call, the call is disconnected and a new LCR dial

tone is connected to the station."; with this, Isoetec is teaching of a means for disconnecting the

telephone from the network during routing of a telephone call from the telephone.],

    means operatively connected to said switch means for generating a current through said

switch means to said first telephone corresponding to said current provided by said network,

**when said first telephone is disconnected from said network by said switch means** [see

pages 1.5-1.16; also see page 4.102, wherein "…each station can be assigned a class of service

for LCR. This class of service determines under what circumstances a more expensive route may

be used if all the lines in the least expensive route are busy."; also see page 12.3, wherein "If

LCR attempts to dial a service and does not receive dial tone from the carrier (e.g. a busy signal

is reached) the line is released, and the telephone number is dialed on the next less expensive

service.", also wherein "The LCR HOOK FLASH option allows the station user to flash

(momentarily disconnect) the outside line when using LCR. Normally, if the LCR key is pressed

during a call, the call is disconnected and a new LCR dial tone is connected to the station."; with

these sections, Isoetec is teaching that corresponding to receiving no dial tone (e.g. a busy signal)

from the carrier, thus corresponding to a current provided by the network, a current is generated

through the switch means when the telephone is disconnected from the network.],

     means operatively connected to said time and date display means and said switch means

for receiving a predetermined dial sequence from said first telephone corresponding to a

predetermined date and time to be displayed and means for changing the displayed time and date

based on the received signals [see pages 4.79-4.81, whereby return times and return dates are

programmed based on DTMF signals from the telephone],

     database means for storing billing rate parameters for determining a least cost

communication path for a call corresponding to said telephone number, based on such factors as

the time and date of the call [see page 4.102-4.104; also see pages 10.1-10.6, being the

customized LCR Database; also see section 15.2],

     means operatively connected to said switch means for detecting and storing said

telephone number originating from the first telephone [see pages 4.102-4.104; also see Figure

10-1 and pages 10.1-10.6, wherein "This information includes number and types of facilities and

services used, and the customer's area code and exchange"; also see pages 4.103, 4.104 and

4.220],

     means for addressing said database means for identifying a plurality of communication

switch paths to said second telephone and the cost rate of each path [see pages 10.1-10.9; also

see pages 4.102-4.104],

     means for comparing the cost rate of each path so as to determine a least cost route [see

pages 10.1-10.9; also see pages 4.102-4.104], and

means operatively connected to said switch means and said second jack means for generating a number sequence corresponding to a desired carrier so that said call is routed through said second jack means to the selected communication path and carrier to establish a switched connection between said first telephone and said second telephone [see pages 10.1-10.9; also see pages 4.102-4.104].

Regarding *claim 29*, Isoetec discloses an apparatus for displaying a time quantity which can be initiated from a telephone of the type capable of generating dual tone multifrequency signals [see page 1.8, whereby the 228 system includes a "DTMF tone generator" and a "DTMF tone receiver"; also see pages 4.79-4.81, whereby return times and return dates are programmed based on DTMF signals from the telephone] comprising

a housing forming an enclosure [228 Cabinet with the Main Distribution Frame (MDF) on page 2.7 (Figure 2-1) and page 3.2 (Figure 3-1)] and comprising first jack means for interconnection to said telephone [page 3.6], and second jack means for connection to a telephone switching network [see page 2.4; also see pages 3.8 and 3.9],

said network normally providing a current to said telephone when said telephone is in use [see page 1.18; also see page 2.4],

means positioned on said housing for visibly displaying a time quantity [see Figure 1-4 on page 1.5; also see page 2.18; also see page 3.1, being the station port that provides digital data to digital display phones; also see Fig. 3-10 on page 3.16, whereby the I/O Panel, positioned on the housing of the cabinet 228, includes a connection to the monitor; also see page 4.181],

switch means operatively connected to said first jack means for disconnecting said

telephone from said network [see page 1.8; also see page 2.4],

means operatively connected to said switch means for generating a current through said

switch means to said telephone corresponding to said current provided by said network, **when**

**said telephone is disconnected from said network by said switch means** [see pages 1.5-1.16;

also see page 4.102, wherein "…each station can be assigned a class of service for LCR. This

class of service determines under what circumstances a more expensive route may be used if all

the lines in the least expensive route are busy.";  also see page 12.3, wherein "If LCR attempts to

dial a service and does not receive dial tone from the carrier (e.g. a busy signal is reached) the

line is released, and the telephone number is dialed on the next less expensive service.", also

wherein "The LCR HOOK FLASH option allows the station user to flash (momentarily

disconnect) the outside line when using LCR. Normally, if the LCR key is pressed during a call,

the call is disconnected and a new LCR dial tone is connected to the station."; with these

sections, Isoetec is teaching that corresponding to receiving no dial tone (e.g. a busy signal) from

the carrier, thus corresponding to a current provided by the network, a current is generated

through the switch means when the telephone is disconnected from the network.],

means operatively connected to said means for displaying a time quantity and said first

jack means for receiving said dual tone multifrequency signals, from said telephone when said

telephone is disconnected from said network [see page 7.14; also see pages 4.79-4.81, wherein

return times and return dates are programmed based on DTMF signals received from the

telephone],

said signals corresponding to said time quantity and for changing the displayed time

quantity based on signals from said telephone [see pages 4.79-4.81, whereby return times and

return dates are programmed based on DTMF signals from the telephone], and

means responsive to a dialing sequence originating on said telephone and operatively

connected to said switch means for connecting said telephone to said network [see pages 4.122-

4.127].

28.    **Claims 1-5, 7-11, and 27** are rejected under 35 U.S.C. 102(b) as being anticipated by

Jabs *et al.* (U.S. Patent Number 5,173,933), issued on Dec. 22, 1992 (hereafter "Jabs").

Regarding *claim 1*, Jabs discloses a device for routing telephone calls along a least cost

route originating from a first telephone to a second telephone having an associated telephone

number via a network having a plurality of alternate communication switch paths corresponding

to different carriers which can be chosen to route the call and normally providing a current to

said first telephone when said first telephone is in use [see col. 4, lines 24-55; also see col. 8,

lines 17-19], comprising

a housing forming an enclosure and comprising first jack means for connection to said

first telephone and second jack means for connection to said network [see col. 6, lines 34-39;

also see col. 8, lines 12-17, whereby the interfaces 108 and 112 are the first jack means and

interfaces 100 and 104 are the second jack means]

switch means operatively connected to said first jack means for disconnecting said first

telephone from said network [col. 8, lines 24-25],

means operatively connected to said switch means for generating a current through said

switch means to the first telephone, corresponding to a current provided by said network [see col.

8, lines 24 and 25; also see col. 9, line 64-col. 10, line 3],

database means for storing billing rate parameters for determining a least cost

communication path for call corresponding to said telephone number [col. 6, line 26 and col. 22,

lines 49-52; also see col. 12, lines 42 and 43],

means operatively connected to said switch means for detecting and storing said

telephone number originating from the first telephone means for addressing said database means

for identifying a plurality of communication switch paths to said second telephone and the cost

rate of each path [col. 10, lines 7-10; also see col. 2, lines 8-15; also see col. 20, lines 53-55; also

see col. 11; also see col. 6, lines 25-30],

means for comparing the cost rate of each path so as to determine a least cost route [see

col. 11-col. 12, line 10; also see col. 4, lines 24-28], and

means operatively connected to said switch means and said second jack means for

generating a number sequence corresponding to a desired carrier so that said call is routed

through said second jack means to the selected communication path and carrier to establish a

switched connection between said first telephone and said second telephone phone [col. 4, lines

49-59; also see col. 20, lines 53-55].

Regarding *claim 2*, Jabs discloses the device discussed above in claim 1, and further teaches that said least cost communication path parameters include the time and date of the call [col. 12, lines 4-6; also see col. 6, lines 53 and 54].

Regarding *claim 3*, Jabs discloses the device discussed above in claim 1, and further teaches that said switch means connects said first telephone to said network during an incoming call [col. 15, lines 19-32].

Regarding *claim 4*, Jabs discloses the device discussed above in claim 1, and further teaches that an internal power supply connected to said means for generating a current [col. 6, lines 44-47].

Regarding *claim 5*, Jabs discloses the device discussed above in claim 1, and further teaches that said means for generating said number sequence comprises a dual tone multifrequency generator [col. 10, lines 7-10; also see cols. 19 and 20].

Regarding *claim 7*, Jabs discloses the device discussed above in claim 1, and further teaches that said detecting means includes a dual tone multifrequency detector [col. 10, lines 7-10; also see col. 20, lines 20-23].

Regarding *claim 8*, Jabs discloses the device discussed above in claim 1, and further teaches of means for maintaining the time and date so as to determine the least cost route based on the time and date of the call [col. 6, lines 53-57; also see col. 12, lines 4-6].

Regarding *claim 9*, Jabs discloses the device discussed above in claim 1, and further teaches that said cost may be given a bias for preference to a given carrier [col. 12, lines 12-15].

Regarding *claim 10*, Jabs discloses the device discussed above in claim 1, and further teaches of means for updating said database means with a current billing rate schedule [col. 6, lines 25-39].

Regarding *claim 11*, Jabs discloses the device discussed above in claim 10, and further teaches that said update means includes a circuit board mounted inside said enclosure, and said database means comprises a removable chip on said circuit board, and means for accessing said removable chip from outside said housing [col. 6, lines 26-40].

Regarding *claim 27*, Jabs discloses a device for routing telephone calls along a least cost route originating from a first telephone to a second telephone having an associated telephone number via a network having a plurality of alternate communication switch paths corresponding to different carriers which can be chosen to route the call and normally providing a current to said first telephone when said first telephone is in use [see col. 4, lines 24-55; also see col. 8, lines 17-19], comprising

a housing forming an enclosure and comprising first jack means for connection to said

first telephone and second jack means for connection to said network [see col. 6, lines 34-39;

also see col. 8, lines 12-17, whereby the interfaces 108 and 112 are the first jack means and

interfaces 100 and 104 are the second jack means]

switch means [interpreted as the "multitasking dispatcher", as read in col. 9, lines 24-61,

which includes the function of "setting to allow outgoing calls through the trunks"] operatively

connected to said first jack means for disconnecting said first telephone from said network,

during routing of a telephone call from said first telephone [col. 4, lines 60-66, wherein "Call

progress through the interface is supervised to insure the presence of voice or data activity such

that call "tear down" (that is call termination) occurs after a period of ring no answer, busy, dead

air, etc."; also see col. 11, lines 48-62, wherein "The interface, upon placement of a call, selects

the channel of least cost (first choice) off hook, and look for loop current and/or dial tone. If loop

current is not detected, the interface on hooks this channel and try either another channel of the

same media (as there could be two or more cellular or land lines) if available, or bring the

channel off hook for the second choice. The interface continues this process until the channels

that are of less cost than satellite are exhausted. If the interface then selects satellite, the

interface selects the least expensive coast earth station.", whereby the interface disconnects a

first network, being a cellular or land line, and then connects to a satellite network, after

placement of a call, thus being "during routing of a telephone call"; also see col. 13, line 46-col.

14, line 3, wherein "If a preselected period of time of busy signal or dead air is detected at 675,

the telephone system goes on hook at 676 and the call is terminated."],

means operatively connected to said switch means for generating a current through said

switch means to the first telephone, corresponding to a current provided by said network, when

said first telephone is disconnected from said network by said switch means [see col. 9, line 64-

col. 10, line 3; also see col. 11, lines 31-62, "The interface, upon placement of a call, selects the

channel of least cost (First choice) off hook, and look for loop current and/or dial tone. If loop

current is not detected, the interface on hooks this channel and try either another channel of the

same media (as there could be two or more cellular or land lines) if available, or bring the

channel off hook for the second choice. The interface continues this process until the channels

that are of less cost than satellite are exhausted.  If the interface then selects satellite, the

interface selects the least expensive coast earth station.", whereby a current is generated through

the multitasking dispatcher to the telephone so as to connect the telephone to a different

network],

database means for storing billing rate parameters for determining a least cost

communication path for call corresponding to said telephone number [col. 6, line 26 and col. 11,

lines 49-52; also see col. 12, lines 42 and 43],

means operatively connected to said switch means for detecting and storing said

telephone number originating from the first telephone means for addressing said database means

for identifying a plurality of communication switch paths to said second telephone and the cost

rate of each path [col. 10, lines 7-10; also see col. 2, lines 8-15; also see col. 20, lines 53-55; also

see col. 11; also see col. 6, lines 25-30],

means for comparing the cost rate of each path so as to determine a least cost route [see

col. 11-col. 12, line 10; also see col. 4, lines 24-28], and

Application/Control Number: 90/007,939                                    Page 41
Art Unit: 3992

    means operatively connected to said switch means and said second jack means for

generating a number sequence corresponding to a desired carrier so that said call is routed

through said second jack means to the selected communication path and carrier to establish a

switched connection between said first telephone and said second telephone phone [col. 4, lines

49-59; also see col. 20, lines 53-55].


### *Claim Rejections - 35 USC § 103*

29.     The text of those sections of Title 35, U.S. Code not included in this action can be found

in a prior Office action.


30.     **Claim 12** is rejected under 35 U.S.C. 103(a) as being unpatentable over Jabs *et al.* (U.S.

Patent Number 5,425,085 (hereafter "Jabs").


    Regarding *claim 12*, Jabs discloses the device discussed above in claim 11, and further

teaches that said means for accessing said removable chip includes a removable cover on said

housing for accessing said chip [see col. 6, lines 34-40]. Particularly, Jabs teaches in column 6,

lines 34-40, that "Where the interface of the present invention is within a housing, the ability to

plug or unplug the external memory cartridge 52 allows for easy upgrading of both tariff

information and system code without requiring the opening of such housing or any special

programming or erasing equipment." With this, Jabs discloses that accessing of the memory

cartridge can be performed by opening the housing. While Jabs prefers the design choice of

plugging and unplugging the memory cartridge to the housing, one of ordinary skill in the art

would have expected that the alternate design of the device having a removable cover on the

housing for accessing the chip, would have performed the same purpose, as even recognized by

Jabs. Therefore, it would have been obvious to one of ordinary skill in this art to have the device

of Jabs include a removable cover on the housing to access a memory cartridge to obtain the

invention as specified in claim 12.

31.    **Claims 20 and 21** are rejected under 35 U.S.C. 103(a) as being unpatentable over the

publication "ISOETEC System/228: Technical Manual", published by ISOETEC

Communications, Inc. and dated July 1998 (hereafter "Isoetec") in view of Jabs *et al*. (U.S.

Patent Number 5,425,085 (hereafter "Jabs").

Regarding *claim 20*, Isoetec discloses the device discussed above in claim 19, and further

teaches that said update means includes a circuit board mounted inside said enclosure [see pages

1.5-1.15].

Application/Control Number: 90/007,939                                    Page 43
Art Unit: 3992

However Isoetec fails to expressly disclose that said database means comprises a removable chip on said circuit board, and means for accessing said removable chip from outside said housing.

Jabs discloses a device that includes an update means having a circuit board mounted inside an enclosure, and a database means that comprises a removable chip on said circuit board, and means for accessing said removable chip from outside said housing [see col. 6, lines 22-40].

Isoetec & Jabs are combinable because they are from the same field of endeavor, being telephone systems having a least cost routing function. At the time of the invention, it would have been obvious to a person of ordinary skill in the art to have a removable chip on the circuit board, as taught by Jabs, in the device of Isoetec. The suggestion/motivation for doing so would have been that a removable chip would allow for easy upgrading of least cost routing data, as recognized by Jabs in column 6, lines 2-40. Therefore, it would have been obvious to combine the teachings of Jabs with the system of Isoetec to obtain the invention as specified in claim 20.

Regarding *claim 21*, Isoetec and Jabs disclose the device discussed above in claim 20, and Jabs further teaches that said means for accessing said removable chip includes a removable cover on said housing for accessing said chip [see col. 6, lines 34-40]. Particularly, Jabs states in column 6, lines 34-40, that "Where the interface of the present invention is within a housing, the ability to plug or unplug the external memory cartridge 52 allows for easy upgrading of both tariff information and system code without requiring the opening of such housing or any special programming or erasing equipment." With this, Jabs discloses that accessing of the memory cartridge can be performed by opening the housing. While Jabs prefers the design choice of

Application/Control Number: 90/007,939                                    Page 44
Art Unit: 3992

plugging and unplugging the memory cartridge to the housing, one of ordinary skill in the art

would have expected that the alternate design of the device having a removable cover on the

housing for accessing the chip, would have performed the same purpose, as even recognized by

Jabs. As discussed above, it would have been obvious to a person of ordinary skill in the art to

have a removable chip on the circuit board, as taught by Jabs, in the device of Isoetec.  The

suggestion/motivation for doing so would have been that a removable chip would allow for easy

upgrading of least cost routing data, as recognized by Jabs in column 6, lines 2-40.  Thus, it

would have been obvious to one of ordinary skill in this art to have the device of Isoetec and Jabs

include a removable cover on the housing to access a memory cartridge to obtain the invention as

specified in claim 21.

## STATEMENT OF REASONS FOR PATENTABILITY AND/OR CONFIRMATION

32.    The following is an examiner's statement of reasons for patentability and/or confirmation

of the claims found patentable in this reexamination proceeding:

**Claims 6 and 17** are deemed as patentable.

Specifically, regarding ***claims 6 and 17***, in the examiner's opinion, it would not have

been obvious to one of ordinary skill in the art, at the time the invention was made, to have the

device, as claimed in claims 1 or 14, respectively, further have the housing substantially

cylindrical with opposing ends, and with the first jack means positioned on one end and the

second jack means positioned on the opposite end.  None of the prior art of record teaches of a

least cost device with this structure.  Further, the examiner can find no motivation based on the

prior art of record that would lead one to construct the claimed devices with this shape for the

housing.  Particularly, the references of Vodavi and Isoetec teach of telephone systems having

least cost routing functions, whereby both references disclose cabinets that contain a plurality of

boards.  A cylindrical structure would not be desirable in a cabinet such as these, and no

motivation is known that would lead one to alter the described devices to have a cylindrical

structure with the first jack means positioned on one end and the second jack means positioned

on the opposite end.  Further, the STC'595 reference states on page 4, lines 4-6, that "It is housed

in a standard box, which is double the size of an ordinary dual BT telephone socket."  There is

no motivation to alter a double-sized ordinary dual British Telecom telephone socket into

cylindrical structure.  Continuing, the Jabs reference discloses an interface between a plurality of

Application/Control Number: 90/007,939                                    Page 46
Art Unit: 3992

telecommunication stations and a plurality of trunks that link to communication carriers of

various media, whereby the interface is adapted for use in an oceangoing vessel. However, there

is no indication that one would desire to have this interface in a substantially cylindrical shape,

with a jack means on each of the sides. Thus, the limitations found in claims 6 and 17 are

patentable over the prior art of record.

Any comments considered necessary by PATENT OWNER regarding the above

statement must be submitted promptly to avoid processing delays. Such submission by the

patent owner should be labeled: "Comments on Statement of Reasons for Patentability and/or

Confirmation" and will be placed in the reexamination file.

### *Conclusion*

33.    Extensions of time under 37 CFR 1.136(a) will not be permitted in these proceedings

because the provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a

reexamination proceeding. Additionally, 35 U.S.C. 305 requires that *ex parte* reexamination

proceedings "will be conducted with special dispatch" (37 CFR 1.550(a)). Extensions of time in

*ex parte* reexamination proceedings are provided for in 37 CFR 1.550(c).

34.    The patent owner is reminded of the continuing responsibility under 37 CFR 1.565(a) to

apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving

Patent No. 5,425,085 throughout the course of this reexamination proceeding.

Application/Control Number: 90/007,939                                    Page 47
Art Unit: 3992

## NOTICE RE PATENT OWNER'S CORRESPONDENCE ADDRESS

Effective May 16, 2007, 37 CFR 1.33(c) has been revised to provide that:

The patent owner's correspondence address for all communications in an *ex parte* reexamination or an *inter partes* reexamination is designated as the correspondence address of the patent.

> *Revisions and Technical Corrections Affecting Requirements for Ex Parte and*
> *Inter Partes Reexamination*, 72 FR 18892 (April 16, 2007)(Final Rule)

**The correspondence address for any pending reexamination proceeding not having the same correspondence address as that of the patent is, by way of this revision to 37 CFR 1.33(c), <u>automatically changed to that of the patent file</u> as of the effective date.**

This change is effective for any reexamination proceeding which is pending before the Office as of May 16, 2007, <u>including the present reexamination proceeding</u>, and to any reexamination proceeding which is filed after that date.

Parties are to take this change into account when filing papers, and direct communications accordingly.

In the event the patent owner's correspondence address listed in the papers (record) for the present proceeding is different from the correspondence address of the patent, it is strongly encouraged that the patent owner affirmatively file a Notification of Change of Correspondence Address in the reexamination proceeding and/or the patent (depending on which address patent owner desires), to conform the address of the proceeding with that of the patent and to clarify the record as to which address should be used for correspondence.

Telephone Numbers for reexamination inquiries:

| | |
|---|---|
| Reexamination and Amendment Practice | (571) 272-7703 |
| Central Reexam Unit (CRU) | (571) 272-7705 |
| Reexamination Facsimile Transmission No. | (571) 273-9900 |

35.    **THIS ACTION IS MADE FINAL.**

A shortened statutory period for response to this action is set to expire TWO MONTHS

from the mailing date of this action.

**Extensions of time under 37 CFR 1.136(a) do not apply in reexamination**

**proceedings**. The provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a

reexamination proceeding.  Further, in 35 U.S.C. 305 and in 37 CFR 1.550(a), it is required that

reexamination proceedings "will be conducted with special dispatch within the Office."

**Extensions of time in reexamination proceedings are provided for in 37 CFR**

**1.550(c).**  A request for extension of time must be filed on or before the day on which a response

to this action is due, and it must be accompanied by the petition fee set forth in 37 CFR 1.17(g).

The mere filing of a request will not effect any extension of time.  An extension of time will be

granted only for sufficient cause, and for a reasonable time specified.

The filing of a timely first response to this final rejection will be construed as including a

request to extend the shortened statutory period for an additional month, which will be granted

even if previous extensions have been granted.  In no event however, will the statutory period for

response expire later than SIX MONTHS from the mailing date of the final action.  See MPEP §

2265.

Application/Control Number: 90/007,939                                   Page 49
Art Unit: 3992

36.     ALL correspondence relating to this ex parte reexamination proceeding should be

directed as follows:

**Please mail any communications to:**

Attn: Mail Stop "Ex Parte Reexam"
Central Reexamination Unit
Commissioner for Patents
P. O. Box 1450
Alexandria VA 22313-1450


**Please FAX any communications to:**

(571) 273-9900
Central Reexamination Unit


**Please hand-deliver any communications to:**

Customer Service Window
Attn: Central Reexamination Unit
Randolph Building, Lobby Level
401 Dulany Street
Alexandria, VA 22314


Any inquiry concerning this communication or earlier communications from the Reexamination
Legal Advisor or Examiner, or as to the status of this proceeding, should be directed to the
Central Reexamination Unit at telephone number (571) 272-7705.

Signed:

Joseph R. Pokrzywa
Primary Examiner
Central Reexamination Unit 3992
(571) 272-7410


Conferees :

MARK J. REINHART
CRU SPE-AU 3992

ERIX KIELIN

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | | |
|---|---|---|
| NTP, INC., | | |
| | Plaintiff, | |
| v. | | Action No. 3:07–CV–548 |
| T-MOBILE USA, INC., | | |
| | Defendant. | |
| NTP, INC., | | |
| | Plaintiff, | |
| v. | | Action No. 3:07–CV–549 |
| CELLCO PARTNERSHIP, | | |
| | Defendant. | |
| NTP, INC., | | |
| | Plaintiff, | |
| v. | | Action No. 3:07–CV–550 |
| AT&T MOBILITY, LLC, | | |
| | Defendant. | |
| NTP, INC., | | |
| | Plaintiff, | |
| v. | | Action No. 3:07–CV–551 |
| SPRINT NEXTEL CORP., | | |
| | Defendant. | |

## MEMORANDUM OPINION

THIS MATTER comes before the Court on Motions to Stay filed by the defendants in the above-styled actions. Since the arguments in favor of those Motions and plaintiff NTP, Inc.'s replies to the defendants' contentions are virtually identical, the Court will dispose of all

1

four motions in this Opinion.  For the reasons stated below, the Motions shall be GRANTED, and these actions shall be STAYED.

<div align="center">I.</div>

On September 7, 2007, NTP, Inc. filed separate suits in this Court against T-Mobile USA, Inc., Cellco Partnership, AT&T Mobility, LLC, and Sprint Nextel Corp, alleging the infringement of eight patents.[1]  Several of those patents were the subject of a suit filed in this Court by NTP against Research in Motion, Ltd.  In December 2002, after a jury found that Research in Motion infringed NTP's patents, the United States Patent & Trademark Office ("PTO") initiated re-examination of six of the patents.  In April and September of the following year, the PTO granted petitions by Research in Motion to re-examine the other two patents.  In 2006, the PTO issued final office actions rejecting the pending claims of each of the eight patents on the basis of prior art that was not litigated in NTP's suit against Research in Motion.  NTP appealed those findings to the PTO's Board of Patent Appeals and Interferences ("BPAI"), and those appeals are currently pending.

After the PTO issued its findings, NTP sued Palm, Inc. in this Court, alleging that Palm infringed seven of the patents involved in these actions.  Subsequently, Palm asked the Court to stay that action, a motion that the Court granted.  See NTP, Inc. v. Palm, Inc., No. 3:06–CV–836 (E.D. Va. Mar. 22, 2007).  The Court noted that (1) the suit was in its early stages, as discovery was not yet complete; (2) NTP's patents might ultimately be found invalid,

---

[1] The patents-at-issue are U.S. Patent Numbers 5,438,611; 5,479,472; 5,436,960; 5,625,670; 5,819,172; 6,067,451; 6,317,592; and 5,631,946.  Those patents cover technology used in wireless communication systems.

<div align="center">2</div>

precluding NTP from prosecuting its claims, or that the patents might be affirmed in part, clarifying the scope of NTP's claims; and (3) staying the suit would not irreparably harm NTP, since it could seek damages for any infringement that occurred during the stay.  See id. at 4–6.

<div align="center">II.</div>

The defendants in these suits rely heavily on the Court's decision in <u>Palm</u>.  They urge the Court to stay these suits because (1) they are in an early stage, as none of the defendants have filed responsive pleadings; (2) a stay would conserve judicial resources by simplifying these suits, either by invalidating some of NTP's pending claims or clarifying the scope of NTP's valid claims; and (3) a stay would not unduly prejudice NTP, which could recover damages for any infringement of its patents that occurs during the stay.

NTP argues that <u>Palm</u> does not dictate the entry of a stay.  First, when the Court stayed <u>Palm</u>, NTP was defending a suit by Oren Tavory, a person claiming that he was the inventor of the patents at issue in these actions.  The Court's resolution of that suit established that NTP owns the patents.  <u>See</u> <u>Tavory v. NTP, Inc.</u>, 495 F. Supp. 2d 531 (E.D. Va. July 17, 2007). In light of that ruling, NTP argues, its claim to the patents-at-issue is stronger than it was at the beginning of this year.  Second, NTP argues that the defendants in these suits are likely to re-litigate claims upheld by the PTO; thus, entering a stay would not conserve judicial resources. Third, NTP argues that the re-examination proceedings, including any appeals of the PTO's conclusions to the Federal Circuit, may last until 2011, when the patents-at-issue will nearly have expired.  Thus, NTP argues that a stay would unduly prejudice its right to enforce patents that – as of the time it filed these suits – are valid.  Finally, NTP argues that, if the Court stays

<div align="center">3</div>

these suits, the stay should be subject to several conditions, including an agreement by the defendants to be bound to the outcome of the proceedings before the PTO.

<div align="center">III.</div>

The Court's power to control its docket gives it the authority to stay proceedings before it, Landis v. N. Am. Co., 299 U.S. 248, 254 (1936), including proceedings that may be affected by a pending re-examination of a patent-in-suit by the Patent and Trademark Office, see Viskase Corp. v. Am. Nat'l Can Co., 261 F.3d 1316, 1328 (Fed. Cir. 2001); see also Ethicon, Inc. v. Quigg, 849 F.2d 1422, 1426 (Fed. Cir. 1988) (explaining that the statute creating the re-examination procedure does not expressly authorize a court to stay proceedings in light of a pending re-examination because Congress believed that the power to do so "already resides with the [c]ourt") (quoting 1980 U.S.C.C.A.N. 6463); Robert H. Harris Co. v. Metal Mfg. Co., 19 U.S.P.Q.2d 1786, 1788 (E.D. Ark.1991) (noting that "[t]he legislative history surrounding the establishment of the reexamination proceeding evinces congressional approval of district courts liberally granting stays").

The Court has previously stayed similar proceedings after considering whether (1) discovery was complete and a trial date was scheduled; (2) a stay would have simplified the matters at issue; and (3) a stay would have unduly prejudiced or clearly disadvantaged the non-moving party.  NTP, Inc. v. Palm, Inc., No. 3:06–CV–836 (E.D. Va. Mar. 22, 2007) (Spencer, J.) (citing Tap Pharm. Prods., Inc. v. Atrix Labs, Inc., 70 U.S.P.Q.2d 1319, 1320 (N.D. Ill. 2004)).  That approach is consistent with rulings by the Federal Circuit that staying proceedings may be appropriate in order to narrow the scope of the dispute, obtain guidance

<div align="center">4</div>

from the PTO, avoid reaching a result inconsistent with findings by the PTO, or prevent the waste of judicial resources. <u>See</u> <u>MercExchange, L.L.C. v. eBay, Inc.</u>, 500 F. Supp. 2d 556, 563 (E.D. Va. July 27, 2007) (Friedman, J.) (citing three opinions by the Federal Circuit).

Applying that test, the Court concludes that a stay is warranted in these four actions. First, trial dates have not been scheduled and discovery has not yet begun. In fact, none of the defendants have filed any responsive pleadings. Since these actions are in an even earlier stage than was the suit filed by NTP against Palm when it was stayed, this factor favors staying these actions.

Second, the outcome of the re-examination proceedings by the PTO will greatly assist the Court in evaluating NTP's claims against these defendants. Not only will the PTO's findings indicate whether these suits should proceed, the findings will clarify which of the nearly two thousand claims at issue in these suits the Court must address. At oral argument, counsel for one of the defendants suggested that preparing to try these suits before the re-examination proceedings are complete would be like trying to hit a moving target, without knowing even what the target looks like. That comparison is apt. Since the PTO will likely invalidate at least some of the claims covered by the patents-at-issue, waiting for the PTO to complete its review will help the Court identify which of those claims need to be litigated, simplifying the resolution of these suits. Accordingly, this factor also suggests that a stay is appropriate.

Finally, a stay will not cause irreparable harm to NTP. By filing these suits, NTP is eligible to recover damages for any infringement of the patents-at-issue that occurs while the re-examination is proceeding (provided that the PTO – and the Federal Circuit, if NTP appeals

any findings by the PTO – conclude that any of the patents-at-issue are valid).  Even though the Court is dismayed by the pace of the re-examination proceedings, their conclusion is closer now than it was when the Court stayed <u>Palm</u>.  Thus, staying these suits poses no greater risk of undue prejudice to NTP than did the stay in <u>Palm</u>.

Additionally, the Court declines to condition the stay on the defendants' acceptance of the PTO's findings.  None of the defendants asked the PTO to re-examine the patents-at-issue.  Nor have they participated in the re-examination proceedings or had any other opportunity to challenge NTP's pending claims.  Moreover, if the BPAI validates any of those claims, the defendants will not be able to appeal that decision to the Federal Circuit.  Accordingly, due process precludes the Court from requiring the defendants to bind themselves to the outcome of those proceedings.

However, the Court concludes that taking measures to preserve the evidence relevant to these actions would be appropriate, and it shall fashion an appropriate Order.

<div align="center">IV.</div>

For the reasons stated above, these actions shall be STAYED.  It is SO ORDERED.

<div style="border:1px solid black;">
_____ /s/ _____
James R. Spencer
Chief United States District Judge
</div>

ENTERED this ___2nd___ day of November 2007

<div align="center">6</div>

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| NTP, INC., <br><br>                Plaintiff, <br><br><br>       v. <br><br><br> T-MOBILE USA, INC., <br>               Defendant. | Action No. 3:07–CV–548 |
| NTP, INC., <br><br>                Plaintiff, <br><br><br>       v. <br><br><br> CELLCO PARTNERSHIP, <br>               Defendant. | Action No. 3:07–CV–549 |
| NTP, INC., <br><br>                Plaintiff, <br><br><br>       v. <br><br><br> AT&T MOBILITY, LLC, <br>               Defendant. | Action No. 3:07–CV–550 |
| NTP, INC., <br><br>                Plaintiff, <br><br><br>       v. <br><br><br> SPRINT NEXTEL CORP., <br>               Defendant. | Action No. 3:07–CV–551 |

<u>ORDER</u>

      THIS MATTER is before the Court on Motions to Stay filed by the defendants in these

actions.  For the reasons stated in the Memorandum Opinion accompanying this Order, these

actions are STAYED.  Plaintiff NTP, Inc. is DIRECTED to notify the Court in pleading form on

April 1, 2008 of the status of the re-examination proceedings by the United States Patent &

Trademark Office concerning the patents at issue in these suits, as well as at six-month intervals after that date until those proceedings are completed.

The parties to these actions are DIRECTED to preserve all evidence related to these actions; the nature of the litigation holds will be specified in detail in an Order to be issued after the parties complete their negotiations with the Honorable Dennis W. Dohnal.

Let the Clerk send a copy of this Order to all counsel of record.

It is SO ORDERED.

_____/s/_____
James R. Spencer
Chief United States District Judge

ENTERED this ___2nd___ day of November 2007