## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

\-----------------------------------------------

**RATES TECHNOLOGY INC.,**

        **Plaintiff,**

   **v.**

**QWEST COMMUNICATIONS**         **Civil Action No. 07-442(JJF)**
**CORPORATION AND QWEST**
**COMMUNICATIONS**
**INTERNATIONAL, INC.,**

       **Defendants**

\-----------------------------------------------

## DECLARATION OF ROBERT L. EPSTEIN

I, Robert L. Epstein, hereby declare:

    1.    I am a partner in Epstein Drangel Bazerman & James, LLP, a law firm specializing in intellectual property matters, located at 60 East 42nd Street, Suite 820, New York, New York 10165. I am counsel of record for plaintiff, Rates Technology Inc., in this case. The matters stated below are true of my own knowledge, and if called as a witness, I could and would testify truthfully to the same.

    2.    I make this declaration in support of plaintiff's opposition to Defendants' Motion to Continue Stay in this case dated March 31, 2008.

3.      I am a patent attorney registered to practice before the United States Patent and Trademark Office (USPTO) since 1973.  I have over thirty years experience in preparing and prosecuting patent applications, and representing clients in related patent matters, before the USPTO.

4.      I am admitted in good standing to practice before the courts of the State of New York, the United States District Courts for the Southern and Eastern Districts of New York, the Court of Appeals for the Second Circuit, the Court of Appeals for the Federal Circuit and the Supreme Court of the United States of America.

5.      Over the last twenty two years, I have represented Rates Technology Inc. (RTI) on a number of intellectual property matters including: (a) the original prosecution before the USPTO of the applications upon which U.S. Patent Nos. 5,425,085 ('085) and U.S. Patent No. 5,579,769 ('769), the RTI patents involved in this lawsuit (collectively the "RTI patents") are based, leading to the allowance of each of the RTI patents; (b) the 1999 reexamination by the USPTO of each of the RTI patents, leading to the confirmation of the validity of all of the claims of each of the RTI patents; and (c) the current reexamination by the USPTO of the '085 patent. As a result, I am familiar with both of the RTI patents involved in this case, the prosecution history of each RTI patent, the reexamination history of each RTI patent and the references considered by the USPTO in conjunction with the original prosecution of each of the RTI patents, the 1999 reexaminations of each of the RTI patents and the current reexamination of the '085 patent.

6.     As attorney for RTI in the current reexamination of the '085 patent, I am personally familiar with that proceeding, and in particular the status of the proceeding as it stands on the date hereof.

7.     The statement by Qwest that "On March 7, 2008, the Patent Office issued a final rejection over all assertable claims of the '085 patent" is incorrect. At no time in this reexamination has the Patent Office ever issued a rejection, final or otherwise, of all of the claims in the '085 patent. In fact, page 45, paragraph 32, of the Office Action dated March 7, 2008 (Exhibit 1 to defendants' motion) states: "Claims 6 and 17 are deemed as patentable."

8.     The statement by Qwest that "This Final Rejection closes prosecution of the '085 patent reexamination." is incorrect. On March 31, 2008, RTI submitted a response to the final rejection which included further arguments concerning the patentability of the rejected claims, supported by the declaration of Shlomo Shur, the head of the group of software engineers responsible for the development, programming and support for two of the telephone systems the manuals for which constitute references upon which the claim rejections are based, solidly refuting the basis for the rejections. A copy of that submission is Exhibit 1 hereto.

9.     Subsequently, on April 3, 2008, Mr. Weinberger, one of the inventors of the '085 patent and the president of RTI, and I traveled to the USPTO for a personal interview with the panel of examiners in charge of the reexamination. At that time, the merits of the rejections were discussed, in particular that the claims are patentable because none of the references teaches means for comparing the cost rate of each (communications) path so as to determine a least cost route (for the telephone call), as is

required by the majority of the rejected claims. Examiner Pokrzywa, the principle signatory on all Office Actions in this reexamination, pointed out that the claims also require means for addressing a database to identify a plurality of communication switch paths and the cost rate of each path, the claims do not explicitly require that the cost rates compared in the comparing means to select the least cost route be obtained for the database.

10.    It was explained to Examiner Pokrzywa that, at least in the view of the Patent Owner (RTI), the claims implicitly required that the source of the cost rates being compared was the database because any other interpretation would render the database and means for addressing the database, both of which are required by the claims, to be superfluous.

11.    Examiner Pokrzywa suggested that if the claims were amended to explicitly state that the cost rates being compared were obtained from the database, same would alleviate his concern in that regard. Although he made he made no commitment to withdraw the rejections, Examiner Pokrzywa invited RTI to submit a supplemental response to the final rejection which he would consider. The impression that both I and Mr. Weinberger came away with was that such an amendment would be favorably considered.

12.    Accordingly, on April 8, 2008, RTI submitted a supplemental response to the final rejection amending the majority of the rejected claims to require that the cost rates being compared be "obtained from said database" as discussed during the interview. A copy of that submission is Exhibit 2 hereto.

13.    Based on the above, my expectation is that the Patent Office will respond to the supplemental response quickly.

14.    In the event that the Patent Office response to RTI's supplemental response is not a confirmation of the patentability of the '085 claims, RTI has the right to appeal the rejections to the Board of Patent Appeals and Interferences. If dissatisfied with the decision of the Board of Patent Appeals and Interference, RTI has the right to appeal same to the U.S. Court of Appeals for the Federal Circuit or to institute a civil action against the Director of the United States Patents and Trademark Office in the United States District Court for the District of Columbia. That appeals process is likely to extend beyond June 1, 2009, the trial date set in this case.

15.    The statement by Qwest that "…the '769 patent claims a system for updating the billing rate parameters used by the least cost routing device claimed in the '085 patent" is incorrect. The preamble of the main claims of the '769 patent all state that the invention claimed is a system of updating the database in "a call rating device used for cost determination for a calling station" or "call rating devices which are associated with respective subscriber calling stations" or for "determining the cost of telephone calls originating from a calling station to a destination calling station".

16.    Other than the above, the main claims of the '769 patent do not specify the structure of the call rating device, other than to require that it have a database and that it be connectable to a telephone line to transmit and receive data. In fact, the patent describes and illustrates the invention as it would be used in a pay telephone system and some of the dependant claims specify that the call rating device is a pay telephone. None

of the claims require that the call rating device have the structure of the device claimed in the '085 patent.

Executed this 15th day of April, 2008, at New York City, New York

Robert L. Epstein

# EXHIBIT 1

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re Reexamination of U.S. Patent No. 5,425,085

Inventor:  Gerald J. Weinberger et al.

Title:  LEAST COST ROUTING DEVICE FOR        March 31, 2008
     SEPARATE CONNECTION INTO PHONE LINE     New York, New York 10165

Reexamination Control No.:   90/007,939

Reexamination Examiner :   Joseph R. Pokrzywa

Art Unit:    3992

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

1690-110


**Attn:  Mail Stop Ex Parte Reexam**
**Control Reexamination Unit**
**Commissioner for Patents**
**P.O. Box 1450**
**Alexandria, Virginia 22313-1450**


    This is in response to the Ex Parte Reexamination Communication mailed March

7, 2008.

STATUS OF THE CLAIMS

1. (pending) A device for routing telephone calls along a least cost route originating from a first telephone to a second telephone having an associated telephone number via a network having a plurality of alternate communication switch paths corresponding to different carriers which can be chosen to route the call and normally providing a current to said first telephone when said first telephone is in use, comprising

a housing forming an enclosure and comprising first jack means for connection to said first telephone and second jack means for connection to said network

switch means operatively connected to said first jack means for disconnecting said first telephone from said network,

means operatively connected to said switch means for generating a current through said switch means to the first telephone, corresponding to a current provided by said network,

database means for storing billing rate parameters for determining a least cost communication path for call corresponding to said telephone number,

2

means operatively connected to said switch means for detecting and storing said telephone number originating from the first telephone,

means for addressing said database means for identifying a plurality of communication switch paths to said second telephone and the cost rate of each path,

means for comparing the cost rate of each path so as to determine a least cost route, and

means operatively connected to said switch means and said second jack means for generating a number sequence corresponding to a desired carrier so that said call is routed through said second jack means to the selected communication path and carrier to establish a switched connection between said first telephone and said second telephone phone.

2. (pending) The device according to claim 1 wherein said least cost communication path parameters include the time and date of the call.

3. (pending) The device according to claim 1 wherein said switch means connects said first telephone to said network during an incoming call.

4. (pending) The device according to claim 1 including an internal power supply

connected to said means for generating a current.

5. (pending) The device according to claim 1 wherein said means for generating said number sequence comprises a dual tone multifrequency generator.

6. (pending) The device according to claim 1 wherein said housing is substantially cylindrical with opposing ends, wherein said first jack means is positioned on one end and said second jack means is positioned on the opposite end.

7. (pending) The device according to claim 1 wherein said detecting means includes a dual tone multifrequency detector.

8. (pending) The device according to claim 1 including means for maintaining the time and date so as to determine the least cost route based on the time and date of the call.

9. (pending) The device according to claim 1 wherein said cost may be given a bias for preference to a given carrier.

10. (pending) The device according to claim 1 including means for updating said database means with a current billing rate schedule.

11. (pending) The device according to claim 10 wherein said update means

4

includes a circuit board mounted inside said enclosure, and said database means comprises a removable chip on said circuit board, and means for accessing said removable chip from outside said housing.

12. (pending) The device according to claim 11 wherein said means for accessing said removable chip includes a removable cover on said housing for accessing said chip.

13. (pending) The device according to claim 10 wherein said update means includes a modem for receiving signals through said telephone line and downloading the update information.

14. (pending) A device for routing telephone calls along a least cost route originating from a first telephone to a second telephone having an associated telephone number via a network having a plurality of alternate communication switch paths corresponding to different carriers which can be chosen to route the call and normally providing a current to said first telephone when said first telephone is in use, comprising

a housing forming an enclosure and comprising first jack means for connection to said first telephone, and second jack means for connection to said network,

5

means positioned on said housing for visibly displaying the time and date,

switch means operatively connected to said first jack means for disconnecting said first telephone from said network,

means operatively connected to said switch means for generating a current through said switch means to said first telephone corresponding to said current provided by said network,

means operatively connected to said time and date display means and said switch means for receiving a predetermined dial sequence from said first telephone corresponding to a predetermined date and time to be displayed and

means for changing the displayed time and date based on the received signals,

database means for storing billing rate parameters for determining a least cost communication path for a call corresponding to said telephone number, based on such factors as the time and date of the call,

means operatively connected to said switch means for detecting and storing said telephone number originating from the first telephone,

means for addressing said database means for identifying a plurality of

6

communication switch paths to said second telephone and the cost rate of each path,

means for comparing the cost rate of each path so as to determine a least cost route, and

means operatively connected to said switch means and said second jack means for generating a number sequence corresponding to a desired carrier so that said call is routed through said second jack means to the selected communication path and carrier to establish a switched connection between said first telephone and said second telephone.

15. (pending) The device according to claim 14 including means positioned on said housing for manually changing the date and time of the display.

16. (pending) The device according to claim 14 wherein said means for generating said number sequence comprises a dual tone multifrequency generator.

17. (pending) The device according to claim 14 wherein said housing is substantially cylindrical with opposing ends, wherein said first jack means is positioned on one end and second jack means is positioned on the other end.

18. (pending) The device according to claim 14 wherein said detecting means

7

includes a dual tone multifrequency detector.

19. (pending) The device according to claim 14 including means for updating said database means with a current billing rate schedule.

20. (pending) The device according to claim 19 wherein said update means includes a circuit board mounted inside said enclosure, and said database means comprises a removable chip on said circuit board, and means for accessing said removable chip from outside said housing.

21. (pending) The device according to claim 20 wherein said means for accessing said removable chip includes a removable cover on said housing for accessing said chip.

22. (pending) The device according to claim 19 wherein said update means includes a modem for receiving signals through said telephone line and downloading the update information.

23. (pending) The device according to claim 14 wherein said cost may be given a bias for preference to a given carrier.

24. (pending) An apparatus for displaying a time quantity which can be initiated from a telephone of the type capable of generating dual tone multifrequency

signals comprising

a housing forming an enclosure and comprising first jack means for interconnection to said telephone, and second jack means for connection to a telephone switching network, said network normally providing a current to said telephone when said telephone is in use,

means positioned on said housing for visibly displaying a time quantity,

switch means operatively connected to said first jack means for disconnecting said telephone from said network,

means operatively connected to said switch means for generating a current through said switch means to said telephone corresponding to said current provided by said network,

means operatively connected to said means for displaying a time quantity and said first jack means for receiving said dual tone multifrequency signals, from said telephone when said telephone is disconnected from said network, said signals corresponding to said time quantity and for changing the displayed time quantity based on signals from said telephone,

9

and means responsive to a dialing sequence originating on said telephone and operatively connected to said switch means for connecting said telephone to said network.

25. (pending) The apparatus according to claim 24 wherein said time quantity is the time of day.

26. (pending) The apparatus according to claim 24 wherein said time quantity is the date.

27. (previously presented) A device for routing telephone calls along a least cost route originating from a first telephone to a second telephone having an associated telephone number via a network having a plurality of alternate communication switch paths corresponding to different carriers which can be chosen to route the call and normally providing a current to said first telephone when said first telephone is in use, comprising

a housing forming an enclosure and comprising first jack means for connection to said first telephone and second jack means for connection to said network

switch means operatively connected to said first jack means for disconnecting said first telephone from said network during routing of a telephone call from said first telephone,

10

means operatively connected to said switch means for generating a current

through said switch means to the first telephone, corresponding to a current

provided by said network, when said first telephone is disconnected from said

network by said switch means,

database means for storing billing rate parameters for determining a least cost

communication path for call corresponding to said telephone number,

means operatively connected to said switch means for detecting and storing said

telephone number originating from the first telephone,

 means for addressing said database means for identifying a plurality of

communication switch paths to said second telephone and the cost rate of each

path,

means actuated subsequent to the detection of said telephone number originating

from the first telephone for comparing the cost rate of each path so as to

determine a least cost route, and

means operatively connected to said switch means and said second jack means for

generating a number sequence corresponding to a desired carrier so that said call

is routed through said second jack means to the selected communication path and

11

carrier to establish a switched connection between said first telephone and said second telephone phone.

28. (previously presented) A device for routing telephone calls along a least cost route originating from a first telephone to a second telephone having an associated telephone number via a network having a plurality of alternate communication switch paths corresponding to different carriers which can be chosen to route the call and normally providing a current to said first telephone when said first telephone is in use, comprising

a housing forming an enclosure and comprising first jack means for connection to said first telephone, and second jack means for connection to said network,

means positioned on said housing for visibly displaying the time and date,

switch means operatively connected to said first jack means for disconnecting said first telephone from said network during routing of a telephone call from said first telephone,

means operatively connected to said first jack means for disconnecting said first telephone from said network,

means operatively connected to said switch means for generating a current through said switch means to said first telephone corresponding to said current provided by said network when said first telephone is disconnected from said network by said switch means,

means operatively connected to said time and date display means and said switch means for receiving a predetermined dial sequence from said first telephone corresponding to a predetermined date and time to be displayed and means for changing the displayed time and date based on the received signals,

database means for storing billing rate parameters for determining a least cost communication path for a call corresponding to said telephone number, based on such factors as the time and date of the call,

means operatively connected to said switch means for detecting and storing said telephone number originating from the first telephone,

means for addressing said database means for identifying a plurality of communication switch paths to said second telephone and the cost rate of each path,

means actuated subsequent to the detection of said telephone number originating

13

from the first telephone for comparing the cost rate of each path so as to

determine a least cost route, and

means operatively connected to said switch means and said second jack means for

generating a number sequence corresponding to a desired carrier so that said call

is routed through said second jack means to the selected communication path and

carrier to establish a switched connection between said first telephone and said

second telephone.

29. (previously presented) An apparatus for displaying a time quantity which can

be initiated from a telephone of the type capable of generating dual tone

multifrequency signals comprising

a housing forming an enclosure and comprising first jack means for

interconnection to said telephone, and second jack means for connection to a

telephone switching network, said network normally providing a current to said

telephone when said telephone is in use, means positioned on said housing for

visibly displaying a time quantity,

switch means operatively connected to said first jack means for disconnecting

said telephone from said network,

14

means operatively connected to said switch means for generating a current through said switch means to said telephone corresponding to said current provided by said network, when said first telephone is disconnected from said network by said switch means,

means operatively connected to said means for displaying a time quantity and said first jack means for receiving said dual tone multifrequency signals, from said telephone when said telephone is disconnected from said network, said signals corresponding to said time quantity and for changing the displayed time quantity based on signals from said telephone, and means responsive to a dialing sequence originating on said telephone and operatively connected to said switch means for connecting said telephone to said network.

## REMARKS

Patent Owner, Rates Technology Inc., hereby requests reconsideration and withdrawal of the rejections of claims 1-5, 7-16, 18-29 under 35 USC 102(b) as anticipated by Isoetec, Vodavi or Jabs et al. (Jabs), the rejection of claim 12 under 35 USC 103(a) as unpatentable over Jabs and the rejection of claims 20 and 21 under 35 USC 103(a) as unpatentable over Isoetec in view of Jabs, based upon the following arguments in favor of patentability and upon the accompanying Declaration of Shlomo Shur under 37 CFR 1.132.

Mr. Shur was the head of the group of software engineers responsible for the development, programming and support of both the Vodavi system and the Isoetec system during the 1988-1990 time period. Accordingly, he is personally familiar with the hardware and operation of both of those systems. More recently, Mr. Shur has been employed as a software engineer by various entities and as a part time consultant to Rates Technology Inc.

Claims 6 and 17 are deemed patentable.

The rejection of claims 1, 2, 5, 7 and 10 under 35 USC 102(b) as anticipated by U.K. Patent Application No. 2,218,595 has been withdrawn.

As set forth in detail below, there are material elements of each of independent claims 1, 14, 24, 27, 28 and 29, and hence the claims dependant on those claims, which

are not taught by the Isoetec, Vodavi or Jabs references. Accordingly, none of the Isoetec, Vodavi and Jabs references can properly form a basis for a rejection of those claims under 35 USC 102(b). Further, the Jabs patent cannot properly be considered to render claim 12 unpatentable under 35 USC 103(a) and the Isoetec and Jabs references cannot rendered claims 20 and 21 unpatentable under 35 USC 103(a).

The reasons why those material elements of the claims cannot be found in the Vodavi, Isoetec or Jabs references is set forth in detail in the Mr. Shur's Declaration, which is based upon Mr. Shur's personal knowledge of the Vodavi and Isoetec systems and upon his review of the Jabs patent.

From 1982 to 1988, Mr. Shur was employed as Vice President of Software Development by an entity that was then known as Isoetec Communications, Inc. In 1988, Isoetec Communications, Inc. combined with Vodavi Communications Systems to form Executone Systems Co. He was employed by Executone as Vice President of Software Development until 1999.

Accordingly, Mr. Shur is personally familiar with both the Isoetec telephone system described in the ISOETEC System/228 Technical Manual dated July 1988, and the Starplus telephone system described in the STARPLUS SPX General Description Installation and Maintenance Manual dated September 1990. He was the head of the group of software engineers that was responsible for the development, programming and support of both the Isoetec system and the Vodavi system during his employment at Isoetec/Executone.

Mr. Shur states that as a result of his employment with Isoetec/Executone, he became personally familiar with the commercially available telephone systems and that

17

during the time period that the Isoetec and the Vodavi technical manuals were published, that is during 1988-1990, the only type of call routing that existed in any telephone system commercially available in the United States was what is now known as Automatic Route Selection ("ARS").

Mr. Shur notes that while the Isoetec and Vodavi technical manuals may have used the term "Least Cost Routing" to describe the call routing performed by those systems, that term was used in the manuals of that period because what is now known as Least Cost Routing ("LCR") did not yet exist. ARS was the technical predecessor of LCR and was the closest thing to LCR that existed at the time the manuals where published.

During the 1988-1990 time period, Mr. Shur states that neither the Isoetec system, the Vodavi system, nor any other telephone system commercially available in the United States of which he was aware, had the capability of doing what is now known as LCR.

Mr. Shur explains that the difference between ARS and LCR is fundamental. The invention of LCR was a significant technical advance, as compared to ARS, because a LCR capable system has the ability to more accurately select the least expensive route for a call based upon. It does that by comparing cost information from the actual rate schedules of different service providers to select a route. An ARS capable system cannot do that.

ARS involves setting up route tables consisting of possible routes for a call made under a particular set of circumstances (destination location, as defined by the area code or exchange of the dialed call; the time of day the call is made; and the day of the week that the call is made, etc.) in the order of preference. Thus, in an ARS system, the route priorities are predetermined and set in the routing tables. In a LCR capable system, the

route priorities are determined automatically in the system after obtaining cost rate information for possible routes from the routing tables and comparing that cost rate information. That is, the routing priorities are not predetermined in an LCR system.

Upon making a call, an ARS system looks at the dialed number and then simply selects the route based on the dialed number in the order of predetermined priorities previously stored in the route tables for the time of day and day of week (after undesirable routes are eliminated, for example, because of lack of capacity, insufficient transmission speed or other technical deficiency). ARS required little memory capacity and no ability to retrieve and compare stored cost rate information.

LCR tables contain different information than ARS route tables. The contain cost rate information related to possible routes. They do not contain lists of routes in order of priority. Further, the information from LCR tables is used by the telephone system in a different manner than that obtained from the ARS route tables. In LCR, the stored information is compared to select a route. In ARS, the route is selected based upon the stored route priorities.

Creating LCR tables involves storing the cost rate information for possible service providers for each destination, time of day and day of the week. No predetermined route priorities exist in the routing tables. Upon placing the call, cost rate information for each of the possible routes is retrieved from storage, based on the dialed number, time of call and day of week. The retrieved cost related information is compared in the system to set the route priorities and select a route.

In order to perform LCR, a system must have (a) sufficient memory storage capacity to store cost rate information for each set of circumstances for each possible

route that could be selected; (b) the ability to retrieve the stored cost rate information for each set of circumstances for each possible route from memory based on the dialed number, time of day and day of week, and (c) the capability of comparing the retrieved cost rate information of the possible routes to select a route. Thus, unlike ARS, LCR requires much more memory capacity as well as the ability to obtain and compare the stored cost rate information in order to determine the route priorities and to select a route.

Since neither the Isoetec system nor the Vodavi system was capable of LCR, it is not surprising that no circuit, part or software disclosed in the Vodavi or Isoetec technical manuals can be identified as being capable of comparing stored cost rate information to select routes.

Based upon his review of the Jabs patent, Mr. Shur concluded that the Jabs interface also performs ARS, like the Isoetec and the Vodavi systems. The Jabs patent explicitly states that the communication medium of least cost is determined by selecting the appropriate medium according to a hierarchy. It does not perform LCR, nor does it include means for comparing stored cost rate information to select a route.

Reconsideration is requested because the following material elements of the claims are not disclosed in the Vodavi manual, the Isoetec manual or the Jabs patent:

## I. "MEANS FOR COMPARING THE COST RATE OF EACH PATH SO AS TO DETERMINE A LEAST COST ROUTE"

The call routing device of the Weinberger patent here at issue was a significant technical advance over the prior art as exemplified by the Isoetec, Vodavi or Jabs systems because the patent device includes means for comparing the cost rate of each path so as to

determine a least cost route. Claims 1-23 of the patent, and newly presented claims 27 and 28, all require that feature.

The Isoetec, Vodavi and Jabs systems each lack "means for comparing the cost rate of each path so as to determine a least cost route" as they each select routes based on routing tables which consist only of predetermined hierarchies of route priorities. These systems have no ability to compare cost rates (or any other parameter) for possible routes to determine a least cost route and hence are unable to select routes based upon a comparison of stored cost rate information, as is possible with the routing device of the invention.

The Vodavi, Isoetec and Jabs systems each perform what is now known as Automatic Route Selection ("ARS") which involves the selection of routes based upon priorities that are determined outside the system. They cannot perform what is now known as Least Cost Routing ("LCR") which requires means in the system for comparing the cost rates of each route to determine the route priorities for use in route selection.

The call routing device of the invention includes circuitry which, in response to the area code and exchange of a dialed number, and the time of day and day of week the call is placed, obtains stored information relating to the cost rate of sending the call to the dialed number via each route for the particular time of day/day of week the call was placed and compares the stored cost rates for each route so as to select a least cost route. Thus, the call routing device of the invention actually determines the route priorities based upon the dialed number, time of day/day of week of the call, and upon stored cost rate information for each route, as the route selection process is taking place. Route priorities have not been predetermined outside the system and then stored in memory as

21

routing tables so the route priorities cannot be retrieved directly from the routing tables. Thus, LCR requires that the system actually have in it means for comparing the cost rate for the various communication paths.

On the other hand, the systems described in each of the references have no internal means of comparing cost rates or anything else to select a least cost route. They cannot determine route priorities; they can only select routes based upon stored route priorities that were previously determined outside the system. The references only have the capability of consulting routing tables and selecting a route based on the predetermined route priorities in the routing tables. That is called ARS.

The difference between a device capable of LCR and a device capable of ARS is the difference between calculating route priorities and looking up predetermined route priorities. In LCR, the device itself is able to determine route priorities based on the dialed number, time of day/day of week and stored cost rate information and then select a route. In ARS, the device simply looks at stored route priorities and selects the available route with the highest priority.

Comparing the cost rate of the possible communication paths to <u>determine</u> the route priorities (LCR) permits route selection based upon cost rates and is used in current sophisticated telephone systems. The telephone systems of the era of the references did not have the storage capacity or the comparison ability to determine the route priorities and therefore could only automatically select routes (ARS) based on stored predetermined route priorities.

It is acknowledged that the term "Least Cost Routing" is used in the references. That is because, in the time frame of the references, what is now known as LCR had not

route priorities in the routing tables be set "at some point". The issue is whether the Vodavi system includes means for comparing the cost rates of the paths in order to determine the route priorities and select a route. It does not and that is why the Examiner is unable to identify any particular circuit, component or software program in or a part of the Vodavi system that is capable of making a comparison of cost the rates of the paths to select a least cost route.

At paragraph 26, with respect to "means for comparing…" limitation, the Examiner again quotes from page 200-8 and also refers to page 300-5 of the Vodavi manual. Page 300-5 says that the routing feature "allows for automatic selection of the most economical trunk according to the number dialed and the time of day/day of week." Further, it says that "When enough digits have been dialed and analyzed to select a route, the appropriate route list entry from that route is determined by the time of day/day of week. Still further, "From within the route list entry selected, the first choice trunk group is searched for an available trunk. If none is available, the other trunks in the route list (if available) are searched. Trunks accessed based upon the order programmed. First line entered in the group will be the first accessed."

Notably, there is <u>no</u> mention in either of those sections of the Vodavi manual referred to by the Examiner of any "means for comparing the cost rate of each path so as to select a least cost route." That is because Vodavi has no such means.

At paragraph 19, where the Examiner discusses the Patent Owner's arguments with respect to Isoetec, he does not even address or attempt to refute the argument that Isoetec has no means for comparing the cost rates for each path so as to select a least cost route. No circuit, component or software program in or part of the Isoetec system is

identified by the Examiner as a means for comparing cost rates to select a route. No such circuit, component or software program exists in Isoetec because like the Vodavi system, the Isoetec system is an ARS system.

At paragraph 27, the Examiner refers to pages 10.1-10.9 and pages 4.102 - 4.104 of the Isoetec manual as teaching the "means for comparing..." Those pages explain that the Isoetec system automatically selects the least expensive available route for an outside line call. They say that the least expensive route for a call is "calculated" using a programmable average duration of a call, which is constantly being calculated by the system and can be entered into the LCR Average Call programming to obtain a more accurate average call length.

Sections 10.4 through 10.9 of the Isoetec manual explain the programming for the four LCR programming screens. According to Section 10.5: "The only thing to program on the *System Programming* screen is the CO line's TRUNK GROUP." However, there are certain options set out in section 10.6.

The categories of information needed for programming the LCR Programming screen are set out in Section 10.7. Section 10.7.14 says that the average call is the time the system uses to calculate the least cost route and should be updated with the calculated average time and set to the nearest half minute. Section 10.7.16 talks about using the calculated average call time per system to update the average call duration.

Nowhere in these sections, or any other section of the Isoetec manual, is there any reference to: (a) programming cost rate information into the system memory or any of the station memories for use in routing; or (b) comparing the cost rate of each path so as to

25

determine a least cost route. This is because the Isoetec system, like the Vodavi system, is performing ARS, not LCR.

The reference to the least expensive route for a call being "calculated" using a programmable average duration of a call is noted. However, the manual does not say where or how the average call duration is used to select a route.

The manual does say that the Isoetec System/228 is designed for use with a customized data base (sic) for routing and that customized database is generated by the manufacturer, Isoetec Communications, Inc. As set forth in the Shur declaration at paragraphs 22 -26, that customized database contained the routing tables that the Isoetec system used to route calls. The database was developed by the manufacturer of the system and loaded in the system by a technician.

Mr. Shur explains that a large mainframe computer at the Isoetec facility was employed to prepare the route tables for use by the customer's system. The average call length was the time used by the system to select the appropriate section of the routing tables to obtain the predetermined route priorities and select the route. The average call length was one of the parameters taken into account in the preparing the ARS tables, as the tables had different sections for different average call length ranges (for example, less than 5 minutes, greater than 5 minutes but less than 10 minutes, etc.) as it did for different area codes/exchanges, different times of the day and different days of the week.

Upon dialing a telephone number, the Isoetec system would select the route for the call based upon route priorities set forth in the section of the stored routing tables that related to the destination of the call, the time of day, the day of week of the particular call and the average call length stored in the system. The average call length would be entered

26

manually in the system on site by a technician. All the system could do was consult the ARS tables in the customized database created for the customer by the DEC computer at the Isoetec/Executone facility to select a route based upon the stored priority assignments in the appropriate section of the ARS tables. The system could not calculate or compare cost rate information to select a route. The value of the average call duration could not be used by the system itself to calculate the route priorities. That could be accomplished only by the mainframe computer at the Isoetec facility.

Accordingly, there is <u>no</u> mention in any section of the Isoetec manual referred to by the Examiner or otherwise of any "means for comparing the cost rate of each path so as to select a least cost route." That is because the Isoetec system had no such means.

At paragraph 23, the Examiner addresses the Patent Owner's argument that Jabs lacks "means for comparing the cost rates of each path so as to determine a least cost route." In that paragraph, the Examiner discusses the routing tables in Jabs and indicates that "the tables are structured such that the least expensive CES resides at the top of the table and progressively more expensive coast earth stations towards the bottom." These are classic ARS tables.

Unable to point to any reference to storing the cost rates for the possible paths or comparing the cost rates for each path so as to select a least cost route, the Examiner states that the system of Jabs "inherently compares" the cost rates because the table of rates is "structure this way" meaning the routes are listed in the order of priority. However, the Examiner is unable to identify any circuit, component or software program in or a part of the Jabs interface that compares the cost rates or even that is capable of making such a comparison. That is because Jabs is only capable of performing ARS.

27

At paragraph 28, the Examiner points to col. 11 to col. 12, line 10, as well as col. 4, lines 24-28 of Jabs to demonstrate that Jabs has the "means for comparing..." necessary to anticipate the claims. The first noted portion of Jabs discloses the scheme used the select route priorities in the Jabs routing tables. There is no mention there, or any where else in the Jabs patent, of comparing cost rates to select a route or having that capability. The second noted section says that the system has a programmable routing feature but does not at that section offer any information as to how that routing feature is programmed or operates.

However, the Jabs patent does explain how the route priorities in the hierarchy are determined, at col. 4, line 28 and again at col. 11, line 40. The patent says that if the ship is docked and there is a land line plugged in and available, the interface will route a telephone call originating from a station channel to the trunk channel connected to the land line. Thus, the highest priority is a land line. If the trunk channel connected to the land line is not available, the interface looks for a trunk channel connected to a cellular line and, if available, routes the telephone call to the cellular line. The cellular line is the second highest priority. If neither land line nor cellular line is available, the interface will route the call to a trunk channel that is connected to a trunk that links to a plurality of carriers via satellite communications. Satellite is the third highest priority. The interface then selects the coast earth station (CES) of least cost, based upon the ocean area in which the vessel is sailing, the destination of the call, the time of day, and any preferential rates extended to the shipping line. That CES is assigned the next highest priority. Additional coast earth stations are assigned priorities on the same basis.

There is no reference in the Jabs patent of the interface having any means for comparing the cost rate for each path to select a route. The above explanation of how the routing tables are constructed indicates that the interface has no such means. See Shur Dec, paragraphs 32-35.

Accordingly, it is clear that neither Isoetec, Vodavi nor Jabs has means for comparing the cost rate of each route to determine a least cost route.

To anticipate, a reference must include every material element of the claim. The "means for comparing the cost rate of each path so as to select a least cost route" is a material element of the claims, as it is the very element of the invention that provides the ability to perform call routing based upon cost rates. Thus, unless a reference has that means, it cannot be properly said to anticipate the claims 1- 23 of the Weinberger patent, or newly presented claims 27 and 28. Neither the Vodavi system, the Isoetec system nor the Jabs interface has means for comparing cost rates for each path to determine a least cost route because they are all Automatic Route Selection (ARS) systems which are not capable of comparing the cost rate of each communications path to determine a least cost route.

Accordingly, because each of the references lack "means for comparing the cost rate of each path so as to determine a least cost route," claims 1-5, 7-10 and 13 cannot be anticipated by the Vodavi manual, claims 1-5, 7-10, 13-16, 18, 19 and 22-28 cannot be anticipated by the Isoetec manual, and claims 1-5, 7-11 and 27 cannot be anticipated by the Jabs patent.

Claim 12 cannot be properly rejected as unpatentable over Jabs because claim 12 is dependant upon claim 1, and is patentable over Jabs for the same reason as claim 1,

that is, Jabs does not teach or suggest the "means for comparing the cost rate of each path so as to determine a least cost route" required by claim 1, as set forth in detail above.

Claims 20 and 21 cannot be properly rejected as unpatentable over Isoetec in view of Jabs because claims 20 and 21 are dependant upon claim 14 and are patentable over the combination of Isoetec and Jabs for the same reason as claim 14, that is, neither Isoetec nor Jabs teaches or suggests the "means for comparing the cost rate of each path to determine a least cost route" required by claim 14, as set forth in detail above.

It is also noted that newly presented claims 27 and 28 each require the additional limitation that the means for comparing the cost rate of each path be "actuated subsequent to the detection of said telephone number originating from said first telephone…" That is another reason why a reference that compares information "at some point" or "inherently compares" information, cannot anticipate those claims. Clearly, in an ARS system, the route priorities are determined and stored before the dialed number is detected.

## II. "SWITCH MEANS… FOR DISCONNECTING SAID FIRST TELEPHONE FROM SAID NETWORK"

In the call routing device disclosed in the Weinberger patent under reexamination, a switch (shown on the drawings as numeral 36) is used to disconnect the calling telephone from the network during the route selection process. Unless the signaling function of the calling telephone is disabled in this manner during the time that the routing device is selecting a route for the call, the dialed number would reach the local central office before the routing device could insert the access code for the selected

carrier into the dialed number to tell the local central office the route selected for that call by the device. If that were to happen, the local central office would route the call in accordance with its own preference, bypassing the routing device and defeating its purpose.

At paragraph 13, the Examiner identified the CO/FX/WATS Trunk Board (COT8) and TIE Truck Board (EMT4) of Vodavi as being the "switch means" that disconnects the telephone from the network because the Vodavi manual teaches that each of those circuit boards have detection circuitry for "disconnect supervision." As explained by Mr. Shur at paragraphs 37-39 of his declaration, the Examiner misunderstands what is meant by "disconnect supervision" in this context and thus the function of these detection circuits.

These trunk boards function as interfaces with different types of trunk lines. They connect a selected trunk line for use for a call. The detection circuits in these trunk boards provide "disconnect supervision" by detecting when a remote telephone goes "on-hook' during a call, meaning that the user of the remote telephone has hung up the receiver on the remote telephone, indicating that the call is terminated. Thus, the detection circuits in these trunk boards serve merely to detect the termination of the call at the remote telephone. They have nothing to do with disconnecting the calling telephone from the network.

Accordingly, it is clear that neither of the trunk boards of Vodavi identified by the Examiner is a switch means for disconnecting the telephone from the network.

At paragraph 19, the Examiner takes the position the Isoetec manual teaches means for disconnecting the telephone from the network because the manual states that if

31

the RLS key is pressed, the switch hook is pressed or the LCR key is pressed during a call, the call is disconnected. However, even if these keys or the switch hook can be considered to be "switch means" as the Examiner suggests, the termination of a call is not the same thing as disconnecting the telephone from the network.

Pressing these keys or replacing the receiver causes the telephone to go "on-hook" to terminate a call. However, even when a call is terminated, the telephone is still connected to the Isoetec telephone system, which in turn is connected to the network. The termination of the call does not change that. When the receiver is again removed from the hook, or one of the buttons is pressed again, an incoming call can be received by the telephone through the Isoetec system or an outgoing call can be made.

The Examiner also refers to the CPU and the Voice and Data Control Modules of the Isoetec system, the latter containing circuitry for voice switching and conference connections. The Examiner points to nothing in the Isoetec manual to indicate that any of those portions of the Isoetec system are switch means or function to disconnect the telephone from the network.

In paragraph 21, the Examiner agues that Jabs has switch means for disconnecting the telephone from the network. However, the Examiner fails to point any circuit in the Jabs interface that disconnects the station channels from the "network." The claims require means...for generating a current..."corresponding to a current provided by said network." The only "network" in the context of Jabs, which could provide a current, would be the land line. The Jabs interface is specifically designed for use with telephones on an ocean going vessel and thus are never connected to the "network" except when the vessel is in port. When the vessel leaves port, the land line is disconnected from the

vessel. However, the Jabs interface does not include any "switch means" for disconnecting the on-board telephones from the "network." There is nothing in the Jabs patent that would lead one would assume anything but that the land line is disconnected by unplugging it.

At paragraph 28, with respect to claim 27, the Examiner points to the "multitasking dispatcher" of Jabs as being the component that disconnects the telephone from the 'network." However, that component, similar to the trunk boards of Vodavi, simply selects a trunk channel for use in accordance the predetermined route priorities in the stored hierarchy. If the first selected trunk channel is not available, the trunk channel with the next highest priority is chosen, etc. until an available trunk channel is selected. This component does not disconnect the calling telephone from the "network" because the calling telephone is not connected to the land line, except in port.

Accordingly, neither the Vodavi system manual, the Isoetec system manual nor the Jabs patent teaches "switch means...for disconnecting said first telephone from said network". This element appears in all claims of the patent, and in all of the newly presented claims. It is clearly a material limitation as the patented call routing device must disconnect the signaling function of the telephone from the network in order to perform its call routing function.

Thus, because none of the references teach "switch means...for disconnecting said first telephone from said network" Claims 1-5, 7-10, and 13 cannot anticipated by the Vodavi manual, Claims 1-5, 7-10, 13-16, 18, 19, and 22-29 cannot anticipated by the Isoetec manual and Claims 1-5, 7-11 and 27 cannot be anticipated by the Jabs patent.

Claim 12 cannot be properly rejected as unpatentable over Jabs because claim 12 is dependant upon claim 1 and is patentable over Jabs for the same reason as claim 1, that is, Jabs lacks "switch means...for disconnecting said first telephone from said network" required by claim 1, as set forth in detail above.

Claims 20 and 21 cannot be properly rejected as unpatentable over Isoetec in view of Jabs because claims 20 and 21 are dependant upon claim 14 and are patentable over the combination of Isoetec and Jabs for the same reason as claim 14, that is, neither Isoetec nor Jabs teach "switch means...for disconnecting said first telephone from said network" required by claim 14, as set forth in detail above.

With respect to newly presented claims 27, 28 and 29, each of those claims contain the additional limitation that the switch means disconnect the telephone from the network "during routing of a telephone call from said first telephone". Thus, even if the trunk boards of Vodavi, the RLS or LCR keys of Isoetec or some circuit of the Jabs interface could be considered to be "switch means" that disconnects the telephone from the network, there is no teaching that those elements act to disconnect the telephone from the network during routing.

### III.    "MEANS CONNECTED TO SAID SWITCH MEANS FOR GENERATING A CURRENT THOUGH SAID SWITCH MEANS TO THE FIRST TELEPHONE..."

In the call routing device of the patent under reexamination, when switch 36 disconnects the calling telephone from the network during route selection, a current source (shown as power supply 76 on the drawings) in the device provides current

through switch 36 to the calling telephone, corresponding to a current provided by the network. The patent claims and the newly presented claims each specifically require that the current generating means be "operatively connected to said switch means" and generate the current to the telephone "through said switch means". The "switch means" is defined in each claim as being the switch that functions to disconnect the telephone from the network.

In paragraph 14, the Examiner identifies the TIE Trunk Board (EMT4) of Vodavi as including the means operatively connected to the switch means for generating a current through said switch means to the first (calling) telephone…, citing page 400-8. However, trunk board EMT4 has been previously identified by the Examiner, at paragraph 13, as one of the trunk boards of Vodavi that is the "switch means". It is hard to see how the same trunk board could be the "switch means" and at the same time be the means that is connected to the switch means and generates current through the switch means.

In any case, as pointed out by Mr. Shur in paragraphs 37 – 40 of his declaration, the EMT4 trunk board is an interface between the telephone system and the network, specifically; four E & M type 6 wire TIE trunks. The current to the telephones provided by the Vodavi system is not provided to the telephones through the EMT4 trunk board. It is provided through the telephone interface boards, as explained on page 500-8.

Which telephone interface board provides current to which telephone depends upon the type of telephone involved, as the Vodavi system can be used with a variety of different types of telephones. The Electronic Telephone Interface Board (ETIB) provides current to electronic telephones and DSS/BLF attendant consoles. The Single Line

Interface Board (SLIB) and Off-Premise Station Interface Board (OPX8) provide current to analog type telephones. Thus, if it is true that the EMT4 trunk board is the switch means of Vodavi that disconnects the telephone from the network, as the Examiner suggests, and it is clear that it is the telephone interface boards in Vodavi that provide current to the telephones, Vodavi lacks "means operatively connected to the switch means for generating current through said switch means to said first telephone".

In paragraph 26, the Examiner points to the Power Failure Transfer Circuit depicted at page 500-16 of the Vodavi. That circuit contains a switch which normally connects a telephone to the telephone interface board (SLIB), the latter providing current to the telephone. As explained in paragraphs 41 and 42 of the Shur declaration, in the event of a power failure, the switch in this circuit changes state to connect the telephone directly to the network, such that the telephone can receive current from the local central office of the network service provider instead of the telephone interface board of the Vodavi system. The purpose of this circuit is to provide at least one working telephone in the event of a power failure that prevents the Vodavi system from operating.

However, the Power Failure transfer Circuit of the Vodavi system does not constitute means for generating a current to the telephone through the switch that disconnects the telephone from the network. Under normal operating conditions, when there is no power failure, the telephone is connected to a telephone interface board (SLIB) which provides the current to the telephone. In that case, the telephone is connected to the network through the trunk boards COT8 or EMT4 and not through the switch in the Power Failure Transfer Circuit. On the other hand, in the event of a power failure, the switch in the Power Failure Transfer Circuit connects the telephone to the

36

powered from the RINGING GENERATOR 94 of Figure 2. The current for the telephone side of the interface is separate from the current for the trunk channel side of the interface which includes the "multitasking dispatcher".

Thus, because each of the references lacks "means operatively connected to said switch means for generating a current through said switch means to the first telephone…" Claims 1-5, 7-10, and 13 cannot be anticipated by the Vodavi manual, Claims 1-5, 7-10, 13-16, 18, 19, and 22-29 cannot anticipated by the Isoetec manual and Claims 1-5, 7-11 and 27 cannot anticipated by the Jabs patent.

Claim 12 cannot be properly rejected as unpatentable over Jabs because claim 12 is dependant upon claim 1 and is patentable over Jabs for the same reason as claim 1, that is, Jabs lacks the "means operatively connected to said switch means for generating a current through said switch means to the first telephone…" required by claim 1, as set forth in detail above.

Claims 20 and 21 cannot be properly rejected as unpatentable over Isoetec in view of Jabs because claims 20 and 21 are dependant upon claim 14 and are patentable over the combination of Isoetec and Jabs for the same reason as claim 14, that is, neither Isoetec nor Jabs, considered individually or in combination, teach "means operatively connected to said switch means for generating a current through said switch means to the first telephone…" required by claim 14, as set forth in detail above.

## GENERAL COMMENTS

With respect to the Examiner's conclusion that the 37 CFR 1.131 declarations of Roger C. Lee and Gerald Weinberger are "ineffective" to overcome each of the references of Vodavi, Isoetec, STC'595, and Jabs, the Patent Owner respectfully suggests that is incorrect with respect to the rejection of claim 12, and the rejection of claims 20 and 21, under 35 USC 103(a), the purpose for which those declarations were submitted.

It is acknowledged that a declaration under 37 CFR 1.131 cannot normally overcome a reference that constitutes a statutory bar under 35 USC 102. However, these rejections are not under 35 USC 102 but instead under 35 USC 103(a), which by definition means that the entire invention is not identically disclosed or described in a single reference and hence is not a statutory bar.

Further, the Examiner's attention is directed to MPEP Section 715.02(I) which states: "Applicant may overcome a 35 U.S.C. 103 rejection based on a combination of references by showing completion of the invention by applicant prior to the effective date of any of the references; applicant need not antedate the reference with the earliest filing date."

Accordingly, it is believed that the Lee and Weinberger declarations are effective to overcome the rejections under 35 USC 103.

In paragraphs 9 – 11 of the Office Action, the Examiner indicates that the Patent Owner has argued that in order to anticipate claims 1, 14 and 24, a reference must teach that the switch means function to disable the signaling function of telephone during route selection and/or that it must teach a double-pole, double-throw switch. That is not so. The

42

Patent Owner did not make that argument previously and does not make that argument now. Those specifics were disclosed in the patent with respect to the patented call routing device and were discussed in the previous response as background for understanding the claim language.

At the end of paragraph 12, the Examiner takes the position that claims 1 and 14 simply require a means that can disconnect the telephone from the network. That is not correct. The claims require <u>switch</u> means that can perform that function.

At paragraph 15, the Examiner points out that the claims do not define the phrase "billing rate parameters", that the claims do not require that the "cost rate" be stored in the database or is a "billing rate parameter" and that the billing rate parameters need to be associated with each possible route. In paragraph 16, it is stated that the claims must be interpreted as broadly as their terms allow. It is respectfully submitted that the claims must be construed in a manner that is in accordance with common sense.

Specifically, it is clear from the claim that the database stores billing rate parameters for determining a least cost communication path for a call, that the database is addressed to identify the possible communication paths and the cost rate of each of those paths and that the comparing means compares the cost rate for each path to determine a least cost route.

If the cost rate retrieved from the database is not at least included in the billing rate parameters that are stored in the database, where did the cost rate for each path in the database come from? If the billing rate parameters are not associated with the possible routes, what is the purpose of the billing rate parameters?

## CERTIFICATE OF SERVICE BY MAIL

A true copy of the foregoing Communication in response to the Ex Parte Reexamination Communication mailed March 31, 2008 and accompanying Declaration of Shlomo Shur, dated March 28, 2008 and RTI Supplemental Litigation List were served on Requestor via first class mail, postage prepaid on March 31 2008, sent to the following address:

> Kory D. Christensen, Esq.
> Stoel Rives LLP
> 201 South Main Street
> One Utah Center, Suite 1100
> Salt Lake City, Utah 84111

Robert L. Epstein

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re Reexamination of U.S. Patent No. 5,425,085

Inventor:  Gerald J. Weinberger et al.

Title:  LEAST COST ROUTING DEVICE FOR
       SEPARATE CONNECTION INTO PHONE LINE

Reexamination Control No.:   90/007,939

Reexamination Examiner:   Joseph R. Pokrzywa

Art Unit:   3992

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**1690-110**

## <u>DECLARATION UNDER 37 CFR §1.132</u>

Shlomo Shur declares as follows:

    1.     I make this declaration in support of the submission of Rates Technology Inc. in response to the Office Action dated March 3, 2008.

    2.     The facts set forth herein are of my personal knowledge and if called upon, I would testify under oath as to the truth of such facts.

    3.     I have Bachelor of Science in Electrical Engineering issued from City College of New York in 1976.

    4.     From 1976 to 1978, I was employed as a software engineer by Quantronix, Inc. of Smithtown, New York. From 1978 to 1982, I was employed by Tie Communications, Inc. of Shelton, Conn. as the Manager of Software Development. From 1982 to 1988, I was employed as Vice President of Software Development by an entity

that was then known as Isoetec Communications, Inc. In 1988, Isoetec Communications, Inc. combined with Vodavi Communications Systems to form Executone Systems Co. I was employed by Executone as Vice President of Software Development until 1999. Isoetec/Executone manufactured and sold telephone systems for use by large residential and small business customers.

5.    Accordingly, I am very personally familiar with both the Isoetec telephone system described in the ISOETEC System/228 Technical Manual dated July 1988, ("Isoetec") and the Starplus telephone system described in the STARPLUS SPX General Description Installation and Maintenance Manual dated September 1990 ("Vodavi") asserted against the patent under reexamination, as I was the head of the group of software engineers that was responsible for the development, programming and support of both the Isoetec system and the Vodavi system during my employment at Isoetec/Executone.

6.    During the time from 1982 to 1999, I became personally familiar with every commercially available telephone system available to residential and business customers in the United States, as a result of my employment at Isoetec/Executone.

7.    Further, I have reviewed the ISOETEC System/228 Technical Manual dated July 1988; the STARPLUS SPX General Description Installation and Maintenance Manual dated September 1990; and U.S. Patent No. 5,173,933 of December 22, 1992 ("Jabs").

8    The Vodavi system hardware is essentially the same as that used in the Isoetec system but the Vodavi system was provided with simpler software so as to have less functional capability. The systems were set up in that manner so that the Vodavi

2

system could be offered for sale for a lower price than the Isoetec system to make the Vodavi system attractive to a customer with less sophisticated telephone system requirements.

9.    During the time period that the Isoetec and the Vodavi technical manuals here at issue were published, that is during 1988-1990, the only type of call routing that existed in any telephone system commercially available in the United States was what is now known as Automatic Route Selection ("ARS"). The Isoetec and Vodavi technical manuals may use the term "Least Cost Routing" but that term was used in the manuals of that period because what is now known as Least Cost Routing ("LCR") did not yet exist. ARS was the technical predecessor of LCR and was the closest thing to LCR that existed at that time. During 1988-1990, neither the Isoetec system, the Vodavi system, nor any other telephone system commercially available in the United States that I am aware of had the capability of doing what is now known as LCR..

10.    The difference between ARS and LCR is fundamental. The invention of LCR was a significant technical advance, as compared to ARS, because LCR has the ability to more accurately select the least expensive route for a call. It does that by comparing cost information from the actual rate schedules of different service providers to select a route. ARS cannot do that.  ARS involves setting up route tables consisting of possible routes for a call made under a particular set of circumstances (destination location as defined by the area code or exchange of the dialed call, the time of the call, the day of the week that the call is made, etc.) in the order of preference. Upon making a call, an ARS system looks at the dialed number and then simply selects the route in the order of preference previously set out on the route tables for the dialed area code or

3

exchange, time of day and day of week, after undesirable routes are eliminated, for example, because of lack of capacity, insufficient transmission speed or other technical deficiency. For example, a call to area code 212, made between 9 a.m. and 11 a.m. on a weekday, would be routed via the route with the highest preference on the ARS route tables for that set of circumstances, if that route had sufficient capacity at that time. If not, the call would be routed via the next preferred route on the route tables for that set of circumstance, if same was technically able to transmit the call, and so on. ARS required little memory capacity and no ability to retrieve and compare stored cost rate information.

11.    LCR also uses stored routing tables. However, the LCR tables contain different information than the ARS route tables. Further, the information from LCR tables is used by the telephone system in a different manner than that obtained from the ARS route tables. Creating LCR tables involves storing the rate schedule for each possible service provider for each destination, time and day of the week. Upon placing the call, cost related information for each of the possible routes is retrieved from storage based on the dialed number, time of call and day of week and the retrieved cost related information is compared in the system to select a route. Thus, in order to perform LCR, a system must have (a) sufficient memory storage capacity to store the rate schedule for each set of circumstances for each possible route that could be selected; (b) the ability to retrieve the stored cost related information for each set of circumstances for each possible route from memory based on the dialed number, and (c) the capability of comparing the retrieved cost information for the possible routes in order to make the route selection. For example, if a call to area code 212 was made between 9 a.m. and 11 a.m. on a Tuesday, the stored LCR tables would be accessed for that destination, time and day of week to

4

retrieve the anticipated cost of such a call by a service provider A and by a service provider B, assuming both routes had sufficient capacity and were otherwise technically adequate. The retrieved cost information for reach route would then be compared by the system and either service provider A or service provider B would be selected to route the call, based on which service provider could route the call least expensively. Thus, unlike ARS, LCR requires much more memory capacity as well as the ability to obtain and compare the stored cost information in order to select a route.

12.     Neither the Isoetec system, the Vodavi system, nor any other telephone system of that type commercially available in the 1988-1990 time frame that I am aware of had sufficient storage capacity, data retrieval ability or comparison capability necessary in order to perform LCR. Hence, neither the Isoetec system nor the Vodavi system was capable of LCR and thus neither of the technical manuals here at issue could have disclosed a telephone system that performed LCR.

13.     The route priority assignments in the ARS route tables can be made based upon any criteria that the customer selects. Cost is usually the, or at least one of the, main factors upon which the priority assignments are made, but it need not be. Other criteria can be used or taken into account in creating the priority list, including: the quality of transmission over the route; the capacity of the route; the speed of transmission over the route; relationships with particular telephone service providers, for example, long distance carriers; the character of signals to be transmitted (analog vs. digital or voice vs. data), etc. Any or all of those characteristics of the routes may play a roll in the assignment of route priorities and hence the creation of the ARS routing tables.

5

16.     The point is, whatever routing criteria are selected, and however those routing criteria are used to determine the priorities and create the route tables, the Isoetec and Vodavi systems of the 1988-1990 time frame did not possess the memory storage capacity sufficient to store the rate schedules for multiple service providers or the software necessary to do anything other than select a route for a dialed number, time and day by looking at the preferences in the ARS route tables. Call routing in those systems could not have been accomplished through the retrieval and comparison of the stored information for various possible routes because those systems did not have the necessary memory storage capacity or the ability to obtain and compare stored information to select a route. I know that because I was personally involved in creating, programming and supporting the Isoetec and Vodavi systems while I was employed by Isoetec/Executone.

17.     The Vodavi technical manual explains the routing function of that system on page 200-8. It says: "The Least Cost routing (LCR) feature allows for the automatic selection of the most economical trunk according to the dialed number and the time of day/day of week." Notably, it does NOT say that route selection is based upon rate schedules or any other cost related parameter. It does NOT say that route selection is based upon a comparison of stored rates or cost. In fact, route selection based on either rates or cost is NOT listed as one of the features of the software package.

18.     The section of Vodavi technical manual that describes programming the route tables confirms the fact that ARS and not LCR was taking place in the Vodavi system. Section 660 discloses the seven different types of tables that can be programmed for route selection in the Vodavi system. Subsection 660.1 teaches how to make entries in, delete entries from and to display exception code tables. Exception code tables

7

provide for special routing based on special codes. For example, dialing a particular character or symbol before the dialed number might cause the call to go directly to another telephone in the office where the system was located, as opposed to the through the route selection process to an outside trunk line. Subsection 660.2 teaches how to program and change entries in the routing tables that insert or delete digits in a dialed number for routing purposes. For example, selection of a particular long distance carrier to route a call might require that a particular local access code be inserted in front of the dialed number before the dialed number is sent. This section teaches the customer how to set those access codes. Subsection 660.3 teaches how to change and display the time table entries in the route tables. Thus, instead of sending calls made between 9 a.m. and 11 a.m. via trunk 1, the customer might select the time interval to select trunk 1 as the route to be only from 9 a.m. to 10 a.m. Subsection 660.4 teaches how to change and display day of the week entries in the routing tables. For example, the customer could alter the routing tables such that all calls on Sundays are sent via trunk 2, whereas all calls on Tuesdays are sent via trunk 1. Subsection 660.5 teaches how to add, delete and display the route preference list tables. Those lists include entries of possible routes according to preferences set by the customer. Section 660.6 teaches the commands necessary to add, delete, change and display a six-digit table used when the system selects routes by looking at the six digit area code and exchange of the dialed telephone number. Similarly, Subsection 660.7 teaches the commands necessary to add, delete, change and display a three-digit table used when the system selects routes by looking at the three digit area code of the dialed telephone number.

8

19.    There is absolutely no teaching in the Vodavi technical manual as to how to enter any service provider rate information into the system, much less the rate schedules for more than one service provider. There is likewise no reference in the Vodavi technical manual to obtaining information from memory and making a comparison of stored information to select a route.

20.    The Isoetec technical manual discusses what it refers to as "Least Cost Routing" generally in Section 10 starting at page 10.1 and in greater detail on pages 4.102-4.103. The manual says that: (a) the least expensive route is "calculated" using a programmable average duration of a call; (b) the cost of a call to a given dialed number is "calculated" for each facility and service a customer has available based upon the Average Call Length; (c) the system is constantly calculating the average length of a call; and (d) the "calculated average call length" is displayed on the LCR Programming Screen and can then be entered into the system to obtain a more accurate average call length.

21.    It is here emphasized that nowhere does the Isoetec technical manual say that the Isoetec system has the capability to compare the cost of a call by more than one route to select the least expensive route. It does not say that the Isoetec system calculates the least expensive route using a programmable average duration of a call. It does not say the Isoetec system calculates the cost of a call to a given dialed number for each facility and service a customer has available based upon the Average Call Length.

22.    In fact, the databases containing the routing tables for each Isoetec system were developed at the Isoetec/Executone facility on a Digital Electronics Corporation (DEC) main frame computer based upon certain information furnished by the customer and on rate schedules for the routes of interest to the customer, which rate schedules were

9

provided by an outside source. The routing tables in the database created by the DEC computer included different sections for different call destinations, times of the day, day of the week, as well as different call duration ranges. The DEC computer assigned the priorities to the various routes for each section: the least expensive route was assigned the highest priority; the next least cost route was assigned the second priority; and so on to form the ARS tables for each particular system. The database with the ARS tables was then downloaded from the DEC computer and inserted into the Isoetec system for that particular customer.

23.    The Isoetec system itself lacked the memory capacity and the means to calculate and compare costs for possible routes to select a least expensive route or to create the route tables based upon that process.

24.    All the Isoetec system could do was to track and calculate the average length of a call made through the system and use that average call length, along with the destination, time of day and day of week information to choose the appropriate section of the stored routing table to select a route based upon the predetermined route priorities set forth in that section.

25.    The Isoetec manual confirms the above statements. Particular attention is directed to Subsection 10.1.2 of the Isoetec System technical manual entitled "Software Requirements." That subsection states that a customized database is generated by Isoetec based upon information provided by the customer, including the number and types of facilities and services used, and the customer's area code and exchange. As indicated previously, the customized database was created by Isoetec/Executone on their mainframe computer and thereafter loaded into the customer's system. The customer

advised Isoetec/Executone of its choice of facilities and services to be used by the customer. That information was used by the Isoetec/Executone mainframe computer to create the ARS tables in the customized database.

26.     The ARS tables created by the Isoetec mainframe computer for the customized database had sections related to the destination of the call (based upon the area code and exchange of the dialed number); the time of day the call was placed; the day of week that the call was placed on; and the average call duration (for example, less than 5 minutes, greater than 5 minutes but less than 10 minutes, etc.) When a number was dialed, the Isoetec system accessed the appropriate routing table section in the customized database based upon the area code/exchange of the dialed number, the time of day, the day of week and the average call duration. It then selected the route based upon the priority assignments in that of the tables.

27.     As indicated on page 10.2, long distance calls are automatically routed via the primary carrier chosen by the customer without the necessity of manually dialing the carrier's local access code or the customer's security code. A secondary carrier may be selected by manually dialing that carrier's local access code, in accordance with Table 10-1, that is, by "dialing around" or bypassing the primary carrier.

28.     As indicated at Subsection 10.3, each station of the system is programmed with LCR keys, which are Trunk Group keys that access LCR, and a LCR class of service. The possible LCR classes of service are: automatic override (if all lines in the least expensive route are unavailable, the next less expensive route is automatically selected), manual override (if all lines of the least expensive route are unavailable, the call is not routed to the next less expensive route unless a manual override is dialed), or

11

no override (if all lines of the least cost route are not available, the call is not routed to the next less expensive route (the user gets a busy signal) and no manual override is possible).

29.    Subsection 10.7 explains what parameters can be programmed into the LCR programming screen by the customer. Figure 10-1 on page 10.6 shows the screen itself. Subsection 10.7.14 states that the average call length is the time the system uses to calculate the least expensive route. As mentioned previously, the average call length was one of the parameters taken into account in selecting the appropriate section of the ARS tables, as the tables had different sections for different average call length ranges (for example, less than 5 minutes, greater than 5 minutes but less than 10 minutes, etc.) as it did for different area codes/exchanges, different times of the day and different days of the week.

30.    Upon dialing a telephone number, the system would select the route for the call based upon route priorities set forth in the section of the stored routing tables that related to the destination of the call, the time of day, the day of week of the particular call and the calculated average call length stored in the system. The average call length would be entered manually in the system on site by a technician. All the system could do was consult the ARS tables in the customized database created for the customer by the DEC computer at the Isoetec/Executone facility to select a route based upon the stored priority assignments in the appropriate section of the ARS tables. The system could not calculate or compare cost information to select a route.

31.    The Isoetec technical manual makes no reference to selecting routes based upon the comparison of stored rates for more than one route. The Isoetec technical

12

manual makes no reference to obtaining cost information for possible routes by addressing a database. It simply did not have those capabilities. Thus, while the ARS capability of the Isoetec system was more sophisticated than that of the Vodavi system, neither system was capable of performing LCR. That is because neither system had sufficient memory storage capacity to perform LCR and neither system was capable of making a comparison of cost information stored in a memory to select a route.

32.    I am not personally familiar with the system described in Jabs. That system is an interface between mobile telecommunications stations and trunk lines. As such, it was not normally a part of a telephone system designed for use by a business customer such as the Isoetec system and Vodavi system described above. The Jabs system was designed for a particular purpose, for use in automatically routing outgoing calls aboard an oceangoing vessel in an economic manner. However, the Jabs system performs ARS, like the Isoetec and the Vodavi systems. It does not perform LCR

33.    The Jabs interface includes components such as station channels that are connected to telecommunication stations, and trunk channels that are connected to trunks that link to the communication carriers of various media. The interface is designed to automate and enhance the capabilities of shipboard communication systems. The interface has a pre-defined number of station channels and the same number of trunk channels. The station channels and trunk channels are interconnected by a pulse code modulated (PCM) "highway."

34.    The interface has a programmable routing feature. That feature automatically provides the route from one of the station channels to the available trunk channel linked to the communication carrier having the medium of least cost. However,

13

the patent explicitly states that the communication medium of least cost is determined by selecting the appropriate medium according to a hierarchy. Thus, the Jabs system is performing ARS and not LCR because the appropriate medium is not selected based upon a comparison of stored cost information.

35.    The patent goes on to explain how the route selection hierarchy is set. If the ship is docked and there is a land line plugged in and available, the interface will route a telephone call originating from a station channel to the trunk channel connected to the land line. If the trunk channel connected to the land line is not available, the interface looks for a trunk channel connected to a cellular line and, if available, routes the telephone call to the cellular line. If neither land line nor cellular line is available, the interface will route the call to a trunk channel that is connected to a trunk that links to a plurality of carriers via satellite communications. The interface then selects the coast earth station (CES) of least cost, based upon the ocean area in which the vessel is sailing, the destination of the call, the time of day, and any preferential rates extended to the shipping line. From that explanation, it is clear that Jabs automatically selects routes in accordance with ARS tables containing the priority hierarchy specified above.

36.    LCR requires that cost parameters for possible routes be stored in a database in the system prior to the route selection process. Once the called number is dialed, the database is accessed in accordance with the dialed number, the time of day and the day of week the call is made. The stored information for the possible routes is retrieved from the database. The stored information is then compared in the system to select the route with the least cost. Thus, having a means for comparing the retrieved information to select the route is essential to LCR. Neither Isoetec, Vodavi nor Jabs have

14

such a comparison means and consequently, none have the capability to perform Least Cost Routing.

37.     Section 400 of the Vodavi manual discusses the common control cards of the Vodavi system. Those cards contain circuit boards including the CO/FX/WATS Trunk Board (COT8) and the TIE Trunk Board (EMT4). The COT8 board is the interface to eight CO, FX, or WATS trunks. The EMT4 board is the interface to four E & M type 4 wire TIE trunks. These boards contain the circuits that the Vodavi system uses to connect a telephone to a particular trunk in accordance with the route selected for a call.

38.     The COT8 and EMT4 trunk boards have detection circuitry for disconnect supervision. The purpose of that detection circuitry is to determine when a remote telephone connected to the Vodavi system through the selected trunk goes "on-hook" during a call, that is, the user of that remote telephone has terminated the call by hanging up the receiver. These circuits do not disconnect the telephones of the Vodavi system from the network.

39.     That section of the Vodavi manual also discusses an Electronic Telephone Interface Board (ETIB), a Single Line Interface Board (SLIB) and an Off-Premise Station Interface board (OPX8). Those boards support the various telephones and consoles of the Vodavi system, including providing current to the telephones and consoles.

40.     The COT8 and EMT4 boards to not provide current to the telephones or to the consoles.

41.     Both the Vodavi system and the Isoetec system have Power Failure Transfer Circuits which I believe are essentially the same. The purpose of such circuits is to detect a power failure, which would normally render the system inoperative preventing

15

the use of any of the system telephones. These circuits, upon detecting a power failure, automatically disconnect at least one telephone from the telephone interface board to which it is normally connected and from which it normally receives current. It then connects that telephone directly to the network. Connecting the telephone to the network renders that telephone operable because it can then receive current from the local central office of the network service provider. Thus, these circuits permit at least one telephone to be used in the event of a power failure by essentially bypassing the system.

42.     However, the Power Failure Transfer Circuits of the Vodavi and Isoetec systems do not themselves provide current to the telephones connected to these circuits. Under normal operating conditions, current is provided to the telephones by the telephone interface boards to which they are connected. Under power failure conditions, the telephones receive current from the local central office of the network service provider.

43.     I have been warned that willful false statements and the like made herein are punishable by fine or imprisonment, or both (18 U.S.C. 1001) and may jeopardize the validity of the above captioned patent under reexamination.

44.     All statements made herein of my own knowledge are true. All statements made herein on information and belief are believed to be true.

_____     3/28/08
Shlomo Shur                   Date

16

# EXHIBIT 2

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re Reexamination of U.S. Patent No. 5,425,085

Inventor: Gerald J. Weinberger et al.

Title: LEAST COST ROUTING DEVICE FOR         April 8, 2008
       SEPARATE CONNECTION INTO PHONE LINE     New York, New York 10165

Reexamination Control No.:   90/007,939

Reexamination Examiner :   Joseph R. Pokrzywa

Art Unit:   3992

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

1690-110

**Attn: Mail Stop Ex Parte Reexam**
**Control Reexamination Unit**
**Commissioner for Patents**
**P.O. Box 1450**
**Alexandria, Virginia 22313-1450**

      This is supplemental to the response dated March 31, 2008 and further in response

to the Ex Parte Reexamination Communication mailed March 7, 2008.

1

## STATUS OF THE CLAIMS

1.(pending)  A device for routing telephone calls along a least cost route originating from a first telephone to a second telephone having an associated telephone number via a network having a plurality of alternate communication switch paths corresponding to different carriers which can be chosen to route the call and normally providing a current to said first telephone when said first telephone is in use, comprising

a housing forming an enclosure and comprising first jack means for connection to said first telephone and second jack means for connection to said network

switch means operatively connected to said first jack means for disconnecting said first telephone from said network,

means operatively connected to said switch means for generating a current through said switch means to the first telephone, corresponding to a current provided by said network,

database means for storing billing rate parameters for determining a least cost communication path for call corresponding to said telephone number,

2

means operatively connected to said switch means for detecting and storing said telephone number originating from the first telephone

means for addressing said database means for identifying a plurality of communication switch paths to said second telephone and the cost rate of each path,

means for comparing the cost rate of each path so as to determine a least cost route, and

means operatively connected to said switch means and said second jack means for generating a number sequence corresponding to a desired carrier so that said call is routed through said second jack means to the selected communication path and carrier to establish a switched connection between said first telephone and said second telephone phone.

2. (currently amended) The device according to claim ~~1~~ 30 wherein said least cost communication path parameters include the time and date of the call.

3. (currently amended) The device according to claim ~~1~~ 30 wherein said switch means connects said first telephone to said network during an incoming call.

4. (currently amended) The device according to claim ~~1~~ 30 including an internal power supply connected to said means for generating a current.

5. (currently amended) The device according to claim ~~1~~ 30 wherein said means for generating said number sequence comprises a dual tone multifrequency generator.

6. (currently amended) A device for routing telephone calls along a least cost route originating from a first telephone to a second telephone having an associated telephone number via a network having a plurality of alternate communication switch paths corresponding to different carriers which can be chosen to route the call and normally providing a current to said first telephone when said first telephone is in use, comprising

a housing forming an enclosure and comprising first jack means for connection to said first telephone and second jack means for connection to said network

switch means operatively connected to said first jack means for disconnecting said first telephone from said network,

means operatively connected to said switch means for generating a current through said switch means to the first telephone, corresponding to a current provided by said network,

4

database means for storing billing rate parameters for determining a least cost

communication path for call corresponding to said telephone number,

means operatively connected to said switch means for detecting and storing said

telephone number originating from the first telephone

means for addressing said database means for identifying a plurality of

communication switch paths to said second telephone and the cost rate of each

path,

means for comparing the cost rate of each path so as to determine a least cost

route, and

means operatively connected to said switch means and said second jack means for

generating a number sequence corresponding to a desired carrier so that said call

is routed through said second jack means to the selected communication path and

carrier to establish a switched connection between said first telephone and said

second telephone phone

~~The device according to claim 1~~ wherein said housing is substantially cylindrical

with opposing ends, wherein said first jack means is positioned on one end and

said second jack means is positioned on the opposite end.

7. (currently amended) The device according to claim ~~1~~ 30 wherein said detecting means includes a dual tone multifrequency detector.

8. (currently amended) The device according to claim ~~1~~ 30 including means for maintaining the time and date so as to determine the least cost route based on the time and date of the call.

9. (currently amended) The device according to claim ~~1~~ 30 wherein said cost may be given a bias for preference to a given carrier.

10. (currently amended) The device according to claim ~~1~~ 30 including means for updating said database means with a current billing rate schedule.

11. (pending) The device according to claim 10 wherein said update means includes a circuit board mounted inside said enclosure, and said database means comprises a removable chip on said circuit board, and means for accessing said removable chip from outside said housing.

12. (pending) The device according to claim 11 wherein said means for accessing said removable chip includes a removable cover on said housing for accessing said chip.

13. (pending) The device according to claim 10 wherein said update means includes a modem for receiving signals through said telephone line and downloading the update information.

14. (pending) A device for routing telephone calls along a least cost route originating from a first telephone to a second telephone having an associated telephone number via a network having a plurality of alternate communication switch paths corresponding to different carriers which can be chosen to route the call and normally providing a current to said first telephone when said first telephone is in use, comprising

a housing forming an enclosure and comprising first jack means for connection to said first telephone, and second jack means for connection to said network,

means positioned on said housing for visibly displaying the time and date,

switch means operatively connected to said first jack means for disconnecting said first telephone from said network,

means operatively connected to said switch means for generating a current through said switch means to said first telephone corresponding to said current provided by said network,

7

means operatively connected to said time and date display means and said switch means for receiving a predetermined dial sequence from said first telephone corresponding to a predetermined date and time to be displayed and

means for changing the displayed time and date based on the received signals,

database means for storing billing rate parameters for determining a least cost communication path for a call corresponding to said telephone number, based on such factors as the time and date of the call,

means operatively connected to said switch means for detecting and storing said telephone number originating from the first telephone,

means for addressing said database means for identifying a plurality of communication switch paths to said second telephone and the cost rate of each path,

means for comparing the cost rate of each path so as to determine a least cost route, and means operatively connected to said switch means and said second jack means for generating a number sequence corresponding to a desired carrier so that said call is routed through said second jack means to the selected communication path and carrier to establish a switched connection between said first telephone and said second telephone.

8

15. (currently amended) The device according to claim 14 31 including means positioned on said housing for manually changing the date and time of the display.

16. (currently amended) The device according to claim 14 31 wherein said means for generating said number sequence comprises a dual tone multifrequency generator.

17. (currently amended) A device for routing telephone calls along a least cost route originating from a first telephone to a second telephone having an associated telephone number via a network having a plurality of alternate communication switch paths corresponding to different carriers which can be chosen to route the call and normally providing a current to said first telephone when said first telephone is in use, comprising

a housing forming an enclosure and comprising first jack means for connection to said first telephone, and second jack means for connection to said network,

means positioned on said housing for visibly displaying the time and date,

switch means operatively connected to said first jack means for disconnecting said first telephone from said network,

means operatively connected to said switch means for generating a current

through said switch means to said first telephone corresponding to said current

provided by said network,

means operatively connected to said time and date display means and said switch

means for receiving a predetermined dial sequence from said first telephone

corresponding to a predetermined date and time to be displayed and

means for changing the displayed time and date based on the received signals,

database means for storing billing rate parameters for determining a least cost

communication path for a call corresponding to said telephone number, based on

such factors as the time and date of the call,

means operatively connected to said switch means for detecting and storing said

telephone number originating from the first telephone,

means for addressing said database means for identifying a plurality of

communication switch paths to said second telephone and the cost rate of each

path,

means for comparing the cost rate of each path so as to determine a least cost

route, and means operatively connected to said switch means and said second jack means for generating a number sequence corresponding to a desired carrier so that said call is routed through said second jack means to the selected communication path and carrier to establish a switched connection between said first telephone and said second telephone

~~The device according to claim 14~~ wherein said housing is substantially cylindrical with opposing ends, wherein said first jack means is positioned on one end and second jack means is positioned on the other end.

18. (currently amended) The device according to claim ~~14~~ 31 wherein said detecting means includes a dual tone multifrequency detector.

19. (currently amended) The device according to claim ~~14~~ 31 including means for updating said database means with a current billing rate schedule.

20. (pending) The device according to claim 19 wherein said update means includes a circuit board mounted inside said enclosure, and said database means comprises a removable chip on said circuit board, and means for accessing said removable chip from outside said housing.

21. (pending) The device according to claim 20 wherein said means for accessing said removable chip includes a removable cover on said housing for accessing

11

said chip.

22. (pending) The device according to claim 19 wherein said update means includes a modem for receiving signals through said telephone line and downloading the update information.

23. (currently amended) The device according to claim ~~14~~ 31 wherein said cost may be given a bias for preference to a given carrier.

24. (pending) An apparatus for displaying a time quantity which can be initiated from a telephone of the type capable of generating dual tone multifrequency signals comprising

a housing forming an enclosure and comprising first jack means for interconnection to said telephone, and second jack means for connection to a telephone switching network, said network normally providing a current to said telephone when said telephone is in use,

means positioned on said housing for visibly displaying a time quantity,

switch means operatively connected to said first jack means for disconnecting said telephone from said network,

12

means operatively connected to said switch means for generating a current through said switch means to said telephone corresponding to said current provided by said network,

means operatively connected to said means for displaying a time quantity and said first jack means for receiving said dual tone multifrequency signals, from said telephone when said telephone is disconnected from said network, said signals corresponding to said time quantity and for changing the displayed time quantity based on signals from said telephone,

and means responsive to a dialing sequence originating on said telephone and operatively connected to said switch means for connecting said telephone to said network.

25. (pending) The apparatus according to claim 24 wherein said time quantity is the time of day.

26. (pending) The apparatus according to claim 24 wherein said time quantity is the date.

27 (currently amended) A device for routing telephone calls along a least cost route originating from a first telephone to a second telephone having an associated telephone number via a network having a plurality of alternate communication

13

switch paths corresponding to different carriers which can be chosen to route the call and normally providing a current to said first telephone when said first telephone is in use, comprising

a housing forming an enclosure and comprising first jack means for connection to said first telephone and second jack means for connection to said network,

switch means operatively connected to said first jack means for disconnecting said first telephone from said network during routing of a telephone call from said first telephone,

means operatively connected to said switch means for generating a current through said switch means to the first telephone, corresponding to a current provided by said network, when said first telephone is disconnected from said network by said switch means,

database means for storing billing rate parameters for determining a least cost communication path for call corresponding to said telephone number,

means operatively connected to said switch means for detecting and storing said telephone number originating from the first telephone,

means for addressing said database means for identifying a plurality of communication switch paths to said second telephone and the cost rate of each path,

means for comparing the cost rate of each path obtained from said database so as to determine a least cost route, and

means operatively connected to said switch means and said second jack means for generating a number sequence corresponding to a desired carrier so that said call is routed through said second jack means to the selected communication path and carrier to establish a switched connection between said first telephone and said second telephone phone.

28. (currently amended)  A device for routing telephone calls along a least cost route originating from a first telephone to a second telephone having an associated telephone number via a network having a plurality of alternate communication switch paths corresponding to different carriers which can be chosen to route the call and normally providing a current to said first telephone when said first telephone is in use, comprising

a housing forming an enclosure and comprising first jack means for connection to said first telephone, and second jack means for connection to said network, means

positioned on said housing for visibly displaying the time and date,

switch means operatively connected to said first jack means for disconnecting said first telephone from said network during routing of a telephone call from said first telephone,

means operatively connected to said switch means for generating a current through said switch means to said first telephone corresponding to said current provided by said network, when said first telephone is disconnected from said network by said switch means,

means operatively connected to said time and date display means and said switch means for receiving a predetermined dial sequence from said first telephone corresponding to a predetermined date and time to be displayed,

means for changing the displayed time and date based on the received signals, database means for storing billing rate parameters for determining a least cost communication path for a call corresponding to said telephone number, based on such factors as the time and date of the call,

means operatively connected to said switch means for detecting and storing said telephone number originating from the first telephone,

means for addressing said database means for identifying a plurality of communication switch paths to said second telephone and the cost rate of each path,

means for comparing the cost rate of each path obtained from said database so as to determine a least cost route, and

means operatively connected to said switch means and said second jack means for generating a number sequence corresponding to a desired carrier so that said call is routed through said second jack means to the selected communication path and carrier to establish a switched connection between said first telephone and said second telephone.

29. (previously presented) An apparatus for displaying a time quantity which can be initiated from a telephone of the type capable of generating dual tone multifrequency signals comprising

a housing forming an enclosure and comprising first jack means for interconnection to said telephone, and second jack means for connection to a telephone switching network, said network normally providing a current to said telephone when said telephone is in use, means positioned on said housing for visibly displaying a time quantity,

switch means operatively connected to said first jack means for disconnecting

said telephone from said network,

means operatively connected to said switch means for generating a current through said switch means to said telephone corresponding to said current provided by said network, when said first telephone is disconnected from said network by said switch means,

means operatively connected to said means for displaying a time quantity and said first jack means for receiving said dual tone multifrequency signals, from said telephone when said telephone is disconnected from said network, said signals corresponding to said time quantity and for changing the displayed time quantity based on signals from said telephone, and means responsive to a dialing sequence originating on said telephone and operatively connected to said switch means for connecting said telephone to said network.

30.(new)  A device for routing telephone calls along a least cost route originating from a first telephone to a second telephone having an associated telephone number via a network having a plurality of alternate communication switch paths corresponding to different carriers which can be chosen to route the call and normally providing a current to said first telephone when said first telephone is in use, comprising

a housing forming an enclosure and comprising first jack means for connection to

18

said first telephone and second jack means for connection to said network

switch means operatively connected to said first jack means for disconnecting said first telephone from said network,

means operatively connected to said switch means for generating a current through said switch means to the first telephone, corresponding to a current provided by said network,

database means for storing billing rate parameters for determining a least cost communication path for call corresponding to said telephone number,

means operatively connected to said switch means for detecting and storing said telephone number originating from the first telephone

means for addressing said database means for identifying a plurality of communication switch paths to said second telephone and the cost rate of each path,

means for comparing the cost rate of each path obtained from said database so as to determine a least cost route, and

means operatively connected to said switch means and said second jack means for

generating a number sequence corresponding to a desired carrier so that said call is routed through said second jack means to the selected communication path and carrier to establish a switched connection between said first telephone and said second telephone phone.

31. (new) A device for routing telephone calls along a least cost route originating from a first telephone to a second telephone having an associated telephone number via a network having a plurality of alternate communication switch paths corresponding to different carriers which can be chosen to route the call and normally providing a current to said first telephone when said first telephone is in use, comprising

a housing forming an enclosure and comprising first jack means for connection to said first telephone, and second jack means for connection to said network,

means positioned on said housing for visibly displaying the time and date,

switch means operatively connected to said first jack means for disconnecting said first telephone from said network,

means operatively connected to said switch means for generating a current through said switch means to said first telephone corresponding to said current provided by said network,

means operatively connected to said time and date display means and said switch means for receiving a predetermined dial sequence from said first telephone corresponding to a predetermined date and time to be displayed and

means for changing the displayed time and date based on the received signals,

database means for storing billing rate parameters for determining a least cost communication path for a call corresponding to said telephone number, based on such factors as the time and date of the call,

means operatively connected to said switch means for detecting and storing said telephone number originating from the first telephone,

means for addressing said database means for identifying a plurality of communication switch paths to said second telephone and the cost rate of each path,

means for comparing the cost rate of each path obtained from said database so as to determine a least cost route, and

means operatively connected to said switch means and said second jack means for generating a number sequence corresponding to a desired carrier so that said call

21

is routed through said second jack means to the selected communication path and

carrier to establish a switched connection between said first telephone and said

second telephone.

REMARKS

This supplemental response is filed subsequent an interview with the panel that took place on April 3. 2008 attended by the undersigned and Gerald J. Weinberger, a co-inventor of the patent under reexamination and president of Rates Technology Inc., the Patent Owner. A statement of the reasons presented at the interview as warranting favorable action is being filed with this supplemental response.

Presented as part of this supplemental response are new independent claims 30 and 31, and amendments to claims 2-10, 15-19, 23, 27 and 28.

The patentability of claims 6 and 17 was confirmed. Accordingly, claims 6 and 17 have been rewritten in independent form so they no longer depend from claims 1 and 14, respectively.

During the interview, the patentability of claims 1-5, 7-10 and 13 rejected as anticipated by Vodavi, claims 1-5, 7-10, 13-16, 18, 19 and 22-28 rejected as anticipated by Isoetec, and claims 1-5, 7-11 and 27 rejected as anticipated by Jabs was discussed. Patent Owner reiterated its argument that none of the references teach "means for comparing the cost rate of each path so as to determine a least cost route" as set forth in detail in the March 31, 2008 response, including the Declaration of Shlomo Shur, and further that it is the well settled that in order to anticipate a claim under 35 USC 102(b), a reference must teach each material limitation of the claim.

Examiner Pokrzywa correctly pointed out that independent claims 1 and 14 do not require that the cost rates compared in the "comparing means" to select the least cost route be obtained from the database and that amending the claims to explicitly require that the cost rates compared in the "comparing means" are obtained from the database would clarify the claims. It was noted that, at least from the Patent Owner's perspective, the claims already implicitly require that the cost rates be obtained from the database, otherwise there would be no purpose for the "means for addressing said database…" limitation of the claims and thus inserting the "obtained from said database" language would not alter the scope of the claims.

Accordingly, new claims 30 are presented herein. Those claims are identical to claims 1 and 14 of the patent, respectively, except that they include the additional clarification that the cost rates which are compared by the "comparing means" are "obtained from said database" as suggested by Examiner Pokrzywa.

Claims 2-5, 7-13 have been made dependant upon claim 30. Claims 15, 16, 18-23 have been made dependant upon claim 31. Claims 27 and 28 have been amended to contain the same "obtained from said database" clarification. Thus, claims 2-5, 7-13, 15, 16, 18-23, 30 and 31 now all include the "obtained from said database" language.

Claims 1 and 14 remain in the case and reconsideration of the rejections thereof is still requested based upon the arguments presented at the interview and the arguments set forth in the previous response.

Claims 24-26 and 29 stand rejected under 35 USC 102(b) as anticipated by Isoetec. As pointed out in the previous response, Isoetec lacks the "switch means...for disconnecting said telephone from said network" and the "means ... for generating a current through said switch means to said telephone..."

Further, these claims requite (a): "said network normally providing a current to said telephone when said telephone is in use" and (b) "means positioned on said housing for visibly displaying a time quantity".

With respect to limitation (a), Figure 1-15 on page 1.16 of the Isoetec manual illustrates the power supplies. Figure 1-16 on page 1.17 of the manual shows that the power supplies are connected to, among other components, Station Port 15640 which in turn is connected to the various telephones and provides the current to run the telephones when they are in use.  The network does not provide current to the Isoetec telephones when the telephones are in use.

With respect to limitation (b), the Examiner points to the housing forming an enclosure as being the "228 Cabinet with the Main Distribution Frame (MDF)" as shown in Figure 2-1 and Figure 3-1. However, page 4.181 states that the "...day, month, year and a clock...appear on the CRT screen."  That CRT is located on the Integrated Operator Terminal: "The Integrated Operator Terminal is equipped with a CRT..." as set forth on page 4.171. That terminal is illustrated in Figure 1-3 on page 1.4 of the Isoetec manual. Thus, the means for visually displaying a time quantity is the CRT of the operator station. It is not "positioned on the housing".

25

Accordingly, Patent Owner respectfully requests confirmation of the patentability of claims 1-26, and of newly presented claims 27-31, as amended.

Respectfully submitted,

Robert L. Epstein, Reg. No. 26451
EPSTEIN DRANGEL
BAZERMAN & JAMES, LLP
Attorneys for Patent Owner
60 East 42nd Street, Suite 820
New York, New York 10165
Tel. No.:  (212) 292-5390
Fax. No.: (212) 292-5391

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re Reexamination of U.S. Patent No. 5,425,085

Inventor:  Gerald J. Weinberger et al.

Title:  LEAST COST ROUTING DEVICE FOR
      SEPARATE CONNECTION INTO PHONE LINE

April 8, 2008
New York, New York 10165

Reexamination Control No.:  90/007,939

Reexamination Examiner :  Joseph R. Pokrzywa

Art Unit:  3992

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**1690-110**

**Attn:  Mail Stop Ex Parte Reexam**
**Control Reexamination Unit**
**Commissioner for Patents**
**P.O. Box 1450**
**Alexandria, Virginia 22313-1450**

## PATENT OWNER'S STATEMENT PURSUANT TO 37 CFR 1.560

On April 3, 2008, the undersigned and Mr. Gerald J. Weinberger, co-inventor of the patent under reexamination and president of Rates Technology Inc., the Patent Owner, had the opportunity to interview the panel in charge of the reexamination, including Examiner Pokrzywa. Mr. Weinberger and I wish to express our thanks to the panel for the courtesies extended to us during the interview.

During the interview, reasons were presented to the panel that warrant favorable action confirming the patentability of patent claims 1-26 and with respect to the patentability of newly presented claims 27-29.

In particular, during the interview, the patentability of claims 1-5, 7-10 and 13 rejected as anticipated by Vodavi, claims 1-5, 7-10, 13-16, 18, 19 and 22-28 rejected as anticipated by Isoetec, and claims 1-5, 7-11 and 27 rejected as anticipated by Jabs was discussed. Patent Owner reiterated its argument that none of the references teach "means for comparing the cost rate of each path so as to determine a least cost route" as set forth in detail in the March 31, 2008 response, including the Declaration of Shlomo Shur, and further that it is the well settled that in order to anticipate a claim under 35 USC 102(b), a reference must teach each material limitation of the claim.

Examiner Pokrzywa correctly pointed out that independent claims 1 and 14 do not require that the cost rates compared in the "comparing means" to select the least cost route be obtained from the database and that amending the claims to explicitly require that the cost rates compared in the "comparing means" are obtained from the database would clarify the claims. It was noted that, at least from the Patent Owner's perspective, the claims already implicitly require that the cost rates be obtained from the database, otherwise there would be no purpose for the "means for addressing said database..." limitation of the claims, and thus inserting the "obtained from said database" language would not alter the scope of the claims.

Accordingly, the Patent Owner was invited to supplement its response to the final rejection dated March 31, 2008 by presenting claims that clarify that the cost rates

compared in the "comparing means" to select the least cost route are "obtained from said database". That supplemental response is filed herewith.

Favorable action with respect to the patentability of the patent claims and of newly presented claims, as now amended, is respectfully requested.

Respectfully submitted,

Robert L. Epstein, Reg. No. 26451
EPSTEIN DRANGEL
BAZERMAN & JAMES, LLP
Attorneys for Patent Owner
60 East 42nd Street, Suite 820
New York, New York 10165
Tel. No.: (212) 292-5390
Fax. No.: (212) 292-5391

## CERTIFICATE OF SERVICE BY MAIL

A true copy of the foregoing Supplement to the Response dated March 31, 2008 and accompanying Patent Owner's Statement Pursuant to 37 CFR 1.560 were served on Requestor via first class mail, postage prepaid on  April 8,  2008, sent to the following address:

                    Kory D. Christensen, Esq.
                    Stoel Rives LLP
                    201 South Main Street
                    One Utah Center, Suite 1100
                    Salt Lake City, Utah 84111


                    _____
                    Robert L. Epstein